Filed 8/22/11 (reposted same date to correct concurring justices)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S077166 |
| v. | ) | |
| | ) | |
| CRANDELL McKINNON, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. CR69302 |
| _____ | ) | |

A jury found defendant Crandell McKinnon guilty of the first degree murders (Pen. Code, § 187)[1] of Perry Coder and Gregory Martin and two counts of possession of a firearm by a convicted felon (§ 12021.1). The jury also found true (1) the allegation that defendant personally used a firearm in the commission of the murders (§ 12022.5) and (2) the multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)).

After a penalty trial, the jury returned a verdict of death. The court denied defendant's motion for new trial (§ 1181) and automatic application to modify the penalty verdict (§ 190.4, subd. (e)) and sentenced him to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in full.

---

**1** All further statutory references are to the Penal Code unless otherwise indicated.

## I. FACTS

### A. Introduction

On January 4, 1994, defendant, a member of the Crips street gang, walked up to Perry Coder behind the Desert Edge Motel, in Banning, and for no apparent reason, placed his gun against Coder's head, and shot him. Coder died almost instantly. About five weeks later, at the nearby Meadowbrook Apartments, defendant and Gregory Martin, a member of the Bloods street gang, argued briefly before defendant fatally shot Martin in the head.

The prosecution presented eyewitness testimony and forensic evidence consistent with these accounts. The Martin murder weapon was found a week after that murder in a car driven by defendant's girlfriend and in which defendant was a passenger. About a month after the murders, while incarcerated in Chino State Prison, defendant told Harold Black, a fellow inmate, that he had shot Martin and a "white boy" at the Desert Edge Motel.

### B. Prosecution Guilt Phase Case

#### 1. The murder of Perry Coder

On the evening of January 4, 1994, defendant, whose nickname was Popeye, was driving a Cadillac with his friend, Orlando Hunt, in the passenger seat. They drove to the Desert Edge Motel in Banning. The motel was located in a high-crime area rampant with drug activities and operated as an apartment-type complex. There was a dirt field behind the motel, to the west.

Gina Lee, who lived at the motel, saw defendant and Hunt arrive. She had seen defendant in her room earlier that day with a black handgun. When he arrived with Hunt that evening, defendant parked on the side of the motel, at the north end of the lot, and he and Hunt got out of the car. Hunt spoke with Lee[2] and

---

[2] Lee and Hunt had a child together.

her cousin, Johnnetta Hawkins, who was with Lee. Defendant and Hunt then walked to the back of the building. A short, White male, subsequently identified as 23-year old Perry Coder was walking on Ramsey Street. Defendant told Hunt "hold on, wait right [here]."

Hunt did not know Coder and thought that defendant might know him or that the two were dealing drugs. He was unaware of any problems between defendant and Coder. Hunt stood by a tree, approximately 47 feet from where Coder's body subsequently was found, and saw defendant walk up to Coder. Without saying anything to Coder, defendant pulled a gun from his coat, extended his right arm "straight out" in front of his chest and shot Coder "for no apparent reason." Coder immediately fell to the ground. Hunt ran from the scene.

During the same evening, Kerry Scott, who lived in Banning, was walking westbound on Ramsey Street when he reached a field adjacent to the Desert Edge Motel and saw Coder,[3] who was walking eastbound on the same street.[4] Coder was alone and walking unsteadily. Scott walked approximately 50 yards into the field and stood next to a tree, approximately 50 yards from where police subsequently found Coder's body. Scott saw defendant[5] approach Coder and stand approximately two to three feet in front of him, "face to face." Without exchanging any words with Coder, defendant extended his right arm straight out, turned his arm in and his gun to the side, and fired four shots. Coder fell to the ground and exhibited no further movement. Scott "took off running."

---

[3]     Scott recognized Coder but had forgotten his name.

[4]     Earlier in the day, Scott walked from Banning to Cabazon, a distance of approximately five miles. Scott frequently walked to and from Cabazon to visit a friend.

[5]     Scott did not know defendant's name and identified him as "Popeye." Scott knew defendant had a sister named "Robin."

3

Lee was outside her motel room when she heard a gunshot and saw defendant and Hunt running through the field. She left the area to buy drugs and returned to her room about 30 minutes later. She saw defendant and Hunt at the motel. Defendant "looked kind of strange" and his eyes were "just big and stuff." He appeared to be very agitated, upset, and hyper. When Lee asked defendant, "what's up," he put his finger to his lips, said "Shhhhh," and told her somebody was dead outside. Before they left the motel, Lee told Hawkins that when she saw defendant outside the motel after hearing the gunshot, he threatened to kill her if she said anything.

Thereafter, at approximately midnight, City of Banning Police Officer Bill Caldwell, Jr., arrived on the scene and found Coder's body lying adjacent to the field between the roadway and the sidewalk. Coder apparently had been clutching a jacket. The police did not recover any shell casings near the body and never found the murder weapon.

The next day, Hunt was sleeping and rolled over to find defendant standing in the doorway of his bedroom. Defendant told Hunt that if he said anything, "this could happen to you."

On December 29, 1994, Caldwell and City of Banning Police Sergeant Marshall Palmer interviewed defendant at Ironwood State Prison in Blythe, regarding the Coder murder.[6] The prosecution played a tape recording of the interview for the jury. During the interview, after defendant initially denied being in Banning in January 1994, he admitted he had passed through the town that month to see his daughter. When Caldwell and Palmer informed defendant that three individuals witnessed him shoot Coder, defendant denied knowing Coder and having shot him.

---

[6] Defendant was in custody for a parole violation in an unrelated matter.

4

Daryl Garber, Chief Forensic Pathologist for Riverside County, performed an autopsy on Coder's body. Coder suffered a single gunshot wound to the head and a black eye associated with the wound. The wound was a "tight contact," meaning the muzzle was actually pressed tightly against Coder's skin when the gun was fired. The wound traversed the brain front to back, with a slightly left-to-right and upward trajectory. The wound caused a rapid death, and there was no other cause of death. There was no exit wound. Dr. Garber opined that the gun inflicting the wound would have been "pretty much level with the ground." Dr. Garber testified that although Coder probably had some detectable life signs for a few minutes, he would have immediately lost consciousness, gone into a coma for a few minutes, and then quickly died. Coder would have become immediately incapacitated, or if he were walking at the time he was shot, he might have continued taking at most one or two steps before falling down. Dr. Garber recovered a bullet from Coder's head during the autopsy.

### 2. *The murder of Gregory Martin*

During the evening of February 12, 1994, Gregory Martin was shot twice in the head in front of the Meadowbrook Apartments in Banning. His wounds were fatal. It was common knowledge that Martin, whose nickname was "Moto," was a member of the Bloods street gang.

Palmer[7] and other Banning police officers arrived at the crime scene, secured the area, and searched unsuccessfully for relevant physical evidence. Officers knocked on doors to see if they could locate any witnesses. Lloyd Marcus was identified as a potential witness and was interviewed by Palmer at the Banning Police Department, within one to one-and-a-half hours of Palmer's arrival at the murder scene.

---

[7]     Palmer was the detective bureau sergeant at the time of the Martin murder.

Marcus told Palmer that during the evening hours of February 12, 1994, he was standing under a carport at the apartment complex when he saw two people arguing in the street, "something about money." Marcus said he was able to see them well because they were standing directly under a streetlight. Marcus identified one of the men as "Moto." Initially, he could not identify the other man, but subsequently told Palmer that his name was "Popeye." Marcus said Moto asked Popeye, "Where's my money?" The two men began pushing each other, and Popeye pulled a gun from his waistband and fired two rounds at Moto.

Marcus described Popeye as an adult Mexican or Asian male, "six-two, six-three, dark shoulder-length hair, weighing about 190 to 220 pounds." Palmer associated defendant with the name Popeye and knew that Martin was a Blood and defendant was a Crip.

Palmer "put the word out" that he needed to talk to Popeye and wanted him brought in for questioning. Palmer and patrol officers searched for defendant at various locations where he was known to hang out, but were unable to locate him until months later, when defendant was in Ironwood State Prison in Blythe, on an unrelated matter.

Riverside County Forensic Pathologist Joseph Choi conducted an autopsy on Martin's body. Martin suffered two gunshot wounds to his head, one just below the eyebrow of his right eye, and the other on the back right side of his head. The presence of gunpowder tattooing on Martin's forehead and between his eyelid and eyelash indicated his eye was open and the lid was folded up when the first wound was inflicted. Dr. Choi estimated the distance between the muzzle and the wound at the time the gun was fired to be approximately six to 12 inches. The wound was fatal, and death occurred within minutes. Dr. Choi recovered the bullet from the back left side of Martin's head. The second gunshot wound was behind Martin's right ear and also would have been rapidly fatal.

6

On February 19, 1994, at around 11:00 p.m., Riverside County Deputy Sheriff Peter Herrera stopped a light blue Cadillac for driving too slowly. Kimiya Gamble, defendant's girlfriend, was driving and defendant was in the front passenger seat. When Herrera stopped them, there was a gun on the front seat between them. Defendant told Gamble to put the gun in her purse, and she did because she knew he was on parole. During a search of the car, Herrera found the loaded gun in Gamble's purse, which was on the front seat of the vehicle. Gamble told Herrera she had borrowed the gun from "some unknown person."

Herrera arrested defendant and Gamble.[8] Before they were taken to the precinct station, and while Gamble was in the police car, defendant told her that she should tell police she bought the gun on the street.[9] Ballistics testing revealed that the gun found during the search of the car was the Martin murder weapon.

In late February 1994, Harold Black was incarcerated with defendant at Chino State Prison. Black grew up in Banning, was a drug user, and occasionally associated with gang members. He knew those who claimed to be Crips and those who claimed to be Bloods, and associated with both. Black and defendant were acquainted with each other, but they were not friends. They were housed in the same dormitory, and Black slept in close proximity to defendant. One night, Black asked defendant why he was in jail. Defendant said that he was in for a gun violation; that he and his girlfriend were riding in a car and had been pulled over; and that he had put a gun in her purse. On another night, defendant asked Black if he knew Moto. Black answered yes, and that he had heard Moto had been shot. Defendant looked at Black, gave "a little smile, and he says, 'I did it.' "

_____

[8]    The arrest report from this incident describes defendant as a 26-year-old African-American male, five feet 10 inches tall, weighing 170 pounds.

[9]    Gamble subsequently was charged with, and pled guilty to, possession of a concealed, loaded weapon.

Defendant said he stayed that night with a friend at the Meadowbrook Apartments, and as he was leaving he saw Moto, crept up on him, pointed a gun at him, said, "this is for Scotty," and shot him in the head. Defendant said Moto "just crumbled, the body just fell." Defendant also told Black that he "shot that white boy down at the Desert Edge motel."

Black explained that "this is for Scotty" referred to Scotty Ware, a Crip who was killed at a party, supposedly by a Blood, and that defendant was a Crip. It was common knowledge that the person who killed Ware was a Blood, supposedly from the Pomona Island Bloods, and was hanging out in Banning. Black said he did not hear defendant's words when he continued to talk about the Coder murder because he was stunned by defendant's description of how Moto crumbled to the ground.

In September 1995, Black ran into defendant again at the Robert Presley Detention Center in Riverside. Defendant asked him whether the police had contacted him and whether he had said anything. Black told him no. When he asked defendant why, defendant said that Gregory Taylor had said something to the police or the district attorney. During this conversation, Black recalled that he had mentioned the shootings to Taylor. Black told defendant that he had not talked to the police or anyone, and had not been questioned.

### C. Defendant's Guilt Phase Case

The defense presented two witnesses, Jessie James Brown and Charles Neazer, in support of its theory of misidentification. Defendant also sought to prove the Martin murder was not gang motivated.

On the night Coder was murdered, Brown[10] and several others, including Nona Woodson and Melva Murray, were in Brown's room at the Desert Edge

---

[10] At the time of trial, Brown was in custody for selling rock cocaine.

Motel. Brown heard one shot fired. After the shot, he waited in the room for 15 to 20 minutes before leaving. He tried to leave with Woodson in Murray's light blue Buick, which was parked in front of Brown's door. The police stopped them and arrested them for "possession." Brown did not see Scott or defendant's car in the parking lot that evening.

Neazer[11] had lived in Banning off and on from 1973 through 1997. He testified that there really was not any gang activity in the Banning area and that the Crips and the Bloods were friends because everyone knew each other. According to Neazer, there had never been any gang activities involving the Crips and the Bloods in Banning.[12] He and Moto hung out in Banning because each had friends and relatives there. A few days before the murder, Neazer, Moto, and defendant were together at the Eastside Park. They were friendly, talking and drinking. Neazer did not believe Scotty Ware was a gang member, but if so, he may have been affiliated with the Bloods. Neazer believed Ware was killed in late 1989 or early 1990.

### D. Prosecution Penalty Phase Case

#### 1. *Prior felony convictions (§ 190.3, factor (c))*

The parties stipulated that defendant was convicted of robbery (§ 211) on June 1, 1989, and being a convicted felon in possession of a handgun (§ 12021.1) on February 6, 1991.

---

[11] Neazer "claimed" the Bloods gang and had prior convictions for drug-related offenses. At the time of trial, he was in custody for involuntary manslaughter.

[12] On cross-examination, when asked if he was aware that the majority of the 13 murder victims in Banning in 1994 were either Crips or Bloods, Neazer said he was aware that "a couple" of them were gang members.

*2. Prior unadjudicated criminal activity involving force or violence*

*(§ 190.3, factor (b))*[13]

The prosecution introduced evidence of the following prior unadjudicated criminal offenses involving force or violence, or the threat to use force or violence, within the meaning of section 190.3, factor (b) (factor (b)).

On December 11, 1984, then 17-year-old defendant committed a robbery of a teacher in the cafeteria of a continuation school in the Banning Unified School District. (See pt. IV.A.3., below.)

On November 12, 1988, defendant was found to be in possession of .357-caliber ammunition, several pieces of rock cocaine and $168 in cash, and was arrested for possession for sale of rock cocaine. (See pt. IV.A.1., below.)

On January 23, 1991, defendant admitted ownership of a Rugar Redhawk revolver handgun that Banning police officers found in his car and that defendant admitted he had purchased that afternoon.

On August 10, 1992, defendant was arrested for battery stemming from a altercation with his sister, Robin McKinnon (Robin). (See pt. IV.A.2., below.)

On February 5, 1997, defendant was found to be in possession of a metal shank, approximately nine inches long, during a search of defendant's cell at the Robert Presley Detention Center in Riverside County. (See pt. IV.A.4., below.)

---

[13] In addition to the evidence described here, the prosecution also presented evidence in aggravation concerning a 1989 altercation between defendant and Linda Bethune in which defendant allegedly hit Bethune. Trial counsel subsequently moved to strike Bethune's testimony on the ground her testimony failed to conform to the proffer and was unreliable. The trial court granted the motion and subsequently instructed the jury not to consider it in aggravation.

### 3. *Victim impact testimony*

Darlene Shelton, Coder's fiancée, testified that she was living with him at the motel when he was murdered. After the police told her that Coder was dead, she became hysterical. Shelton was pregnant with their child when he was murdered and "almost lost the baby" because "his death . . . affect[ed] me so bad." Shelton's other child considered Coder his father and missed him very much.

Dawn Coder, Coder's sister, testified that she was near the scene of the crime when Coder was murdered, and the police informed her of his death. Thereafter, Dawn was an "emotional wreck" for a week. The thyroid condition she had at the time of the murder worsened. She mourned Coder's death for a year "on the streets." She missed Coder because he was no longer available to guide her with her problems.

Suzanne Coder, Coder's mother, testified that she was at the scene of the murder. After hearing shots, she went outside and saw the feet of a partially covered body in the street and knew by their size that they were Coder's. When the prosecutor asked her how close she was to Coder, she stated that Coder was partially deaf and had a twin and that he and his siblings were close. After Coder's murder, she had "fits of depression" and cried most of the time.

Mary Ann Martin, Martin's sister, testified that she had another brother who was killed within five months of Martin's death. As a result of Martin's death, she no longer trusted people and stayed to herself.

### E. Defendant's Penalty Phase Case

Defendant's mother, Janie Scott (Janie), his sister Jovina Brown, and his estranged father, Robert Smith, testified on his behalf. Janie and Smith met when Janie was 17 years old. Smith was married then and continued to have ongoing relationships with other women during his relationship with Janie. Janie and Smith had three other children: defendant's sisters, Robin, Jovina, and Marcina. Smith had other families and did not live with Janie and their children on a regular

11

basis. He would come by about three times a month, typically at the beginning of each month. He took all of Janie's welfare money and never provided financial support. Janie and the children often went hungry. She had to rely on the charity of family and friends to survive. When Smith was in their lives, they never celebrated birthdays or holidays.

Smith was a serious heroin addict and injected the drug several times a day, often in front of the children. He described how he would fund his habit by committing armed robbery and larceny, and selling heroin.

Smith was physically abusive to Janie, frequently in front of their children. Smith slapped Janie when she was pregnant with Jovina, and during one argument, burnt her arm with a cigarette. Once, Smith beat Janie continuously as they walked from their house to her sister's house, on the other side of town. He beat her again once they arrived. On another occasion, Smith punched Janie in the stomach with his fist when she was seven months pregnant with defendant.

Smith began physically abusing defendant at the time he started to walk. He beat all of the children, except Robin, with belts and electrical cords. When defendant was two years old, Smith held him up by one hand, beat him, and threw him in a closet. He often would shake the children like they were rag dolls, beat them, and put them in dark closets for hours. The children were terrified of Smith. At times, Janie would have to soak the children in Epsom salt baths in order to close and heal the wounds Smith inflicted on them. Defendant and Jovina sought comfort from each other.

Growing up, defendant feared Smith and began to have nightmares when he was three years old. He would wake up from his sleep at night, screaming that Smith was beating him. When defendant wet his bed, Smith would beat him and make him stand in the corner, for hours, in his soiled underwear.

12

In 1971, the family lived in the projects, an area rampant with drug activity and violent crimes, including rapes, fights, and shootings. On one occasion, defendant and Jovina were playing outside when they witnessed someone hit a man in the head with a baseball bat and "there was blood everywhere." When he was five years old, defendant cut off part of one of his fingers. Defendant received good grades in school.

In 1972, Smith went to prison upon his conviction for murder. He had no further contact with Janie and their children. Thereafter, Janie became romantically involved with Troy Scott (Troy).

Janie married Troy and, in 1975, the family moved to California. Troy began to use heroin, sometimes in front of the children. Occasionally, they experienced financial hardship, had little food to eat, and went without electricity and gas.

Troy physically abused Janie, but not in front of the children. Troy also slapped defendant and once beat him with a belt. When defendant wet the bed, Janie often made him lie in it for a couple of days before allowing him to clean himself. Eventually, Troy was unable to work, and the family went on welfare. Defendant was protective of his siblings.

Around 1976, the family moved to Riverside County. Defendant continued to do well academically and played Pop Warner football. He continued to write poetry, which he had begun to do at an early age.

When defendant was 14 or 15 years old, he began to have trouble with the law. He was shot in the arm, elbow, and leg. The family moved to Banning. He became more protective of his mother.

Defendant continued to write poetry over the years, including while awaiting trial in this case. He was a good father to his daughter, who was about nine years old at the time of trial. Defendant was a good son to his mother, and a

13

good brother to his sisters.  Defendant loves his nieces and nephews and tells them to obey their mother and stay out of trouble.

## II.  PRETRIAL ISSUES

### A.  Denial of Severance

Defendant contends the trial court abused its discretion in denying his pretrial motion to sever the Coder murder charge and its related firearm-possession charge from the Martin murder charge and its related firearm-possession charge.[14]  He additionally argues that, even if the trial court did not abuse its discretion at the time it denied his motion, his joint trial actually resulted in gross unfairness amounting to a denial of due process.  As we explain, defendant's contentions are without merit.

Section 954 governs joinder and severance, providing in pertinent part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order

---

[14]     Defendant claims the erroneous denial of his severance motion violated his Fifth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, and reliable verdicts.  Pretrial, the trial court granted counsel's motion to deem all of his trial objections and motions to be made under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  These additional constitutional arguments are therefore not forfeited on appeal.  (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)  Except as otherwise indicated, defense counsel did not urge that different legal standards governed the constitutional and nonconstitutional aspects of his objections, but instead simply implied that insofar as the trial court's act or omission was wrong for the reasons actually presented to the court, it had the additional legal consequence of violating the Constitution.  In such cases, per our standard practice, "we resolve defendant's multiple constitutional claims without separate discussion.  Rejection of a claim on its merits necessarily disposes of the additional constitutional 'gloss.'  (E.g., *People v. Wallace* (2008) 44 Cal.4th 1032, 1050, fn. 4.)"  (*People v. Hartsch* (2010) 49 Cal.4th 472, 493, fn. 19 (*Hartsch*).)

them to be consolidated . . . .  provided, that the court in which a case is triable, in the interest of justice and for good cause shown, may, in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ."  When, as defendant concedes here, the statutory requirements for joinder are satisfied, a defendant has the burden to clearly establish a potential of prejudice sufficient to warrant separate trials.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1283; *People v. Stitely* (2005) 35 Cal.4th 514, 531 (*Stitely*).)

"[T]he trial court's discretion under section 954 to deny severance is broader than its discretion to admit evidence of uncharged crimes under Evidence Code section 1101" because, in large part, a joint trial "ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials."  (*People v. Bean* (1988) 46 Cal.3d 919, 935-936; accord *Hartsch*, *supra*, 49 Cal.4th at p. 493.)  "Denial of a severance motion may be an abuse of discretion if the evidence related to the joined counts is not cross-admissible; if evidence relevant to some but not all of the counts is highly inflammatory; if a relatively weak case has been joined with a strong case so as to suggest a possible 'spillover' effect that might affect the outcome; or one of the charges carries the death penalty."  (*People v. Cummings*, *supra*, 4 Cal.4th at p. 1283; see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1128-1129 (*Zambrano*); *People v. Bradford* (1997) 15 Cal.4th 1229, 1315 (*Bradford*.)  In assessing whether there was an abuse of discretion, we examine the record before the trial court at the time of its ruling.  (*Zambrano*, *supra*, at p. 1128.)  Here, we conclude the trial court's denial of severance was not an abuse of discretion.

Defendant argues at length that the trial court erred in finding evidence related to the two murders to be cross-admissible.  We need not, and do not, decide this question, however, because, as we hereafter explain, defendant fails to

15

establish that, notwithstanding any absence of cross-admissibility, he was unfairly prejudiced by joinder of the two murder cases. " 'While we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice.' " (*People v. Sandoval* (1992) 4 Cal.4th 155, 173, quoting *People v. Mason* (1991) 52 Cal.3d 909, 934; see *Bradford*, *supra*, 15 Cal.4th at p. 1316.) "[E]ven if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion." (*People v. Geier* (2007) 41 Cal.4th 555, 577 (*Geier*), citing *Stitely*, *supra*, 35 Cal.4th at pp. 531-532; see *Bradford*, *supra*, 15 Cal.4th at pp. 1317-1318.) As we discuss below, defendant fails to persuade us that factors other than the lack, if any, of cross-admissibility, demonstrate the need for severance.

Neither murder was especially likely, or more likely than the other, to inflame the jury's passions. Each killing was cruel and brutal and committed for seemingly trivial reasons. Contrary to defendant's assertions, the proffered gang evidence in the Martin case was not unduly inflammatory. As we explain in part III.A.3, below, the prosecution did not proffer evidence of any specific acts of violence between members of the gangs involved in Martin's murder other than, of course, evidence that his murder was connected to a prior gang-related murder. This evidence, however, paled in comparison to the evidence of the most prejudicial facet of the Coder murder—its absolute senselessness.

Defendant's argument that the asserted superficial similarities between the crimes (i.e., both victims were shot in the head, both murders were committed at night) invited the jurors improperly to cumulate the evidence and consider the charges in concert is unpersuasive. This was not a matter in which a weak case

16

was joined with a strong case, or with another weak case, thereby "causing a spillover effect that might have unfairly altered the outcome of the trial." (*People v. Stanley* (2006) 39 Cal.4th 913, 935.) Strong evidence supported both cases.

It is true, as the jury learned, that most of the prosecution witnesses had suffered prior convictions and had substance abuse problems. Harold Black had a pending robbery charge at the time of trial. Nonetheless, defendant confessed to each murder, and he was identified by eyewitnesses as the perpetrator of each crime. The eyewitness testimony in the Coder case, moreover, was materially consistent with the forensics evidence showing that he was shot in the head at close range and that the gun was level to the ground and pressed against his head when defendant shot him. In addition, the forensics evidence corroborated the testimony of Orlando Hunt and Kerry Scott that Coder took at most a couple of steps after he was shot before he fell to the ground.

In the Martin case, the forensics evidence corroborated eyewitness Lloyd Marcus's statement that the killer fired two rounds at Martin at close range. Also, the prosecution presented evidence that, within approximately one week after the murder, defendant gave the murder weapon to his girlfriend. Thus, the evidence in each case was equally strong. We see no possibility that the jury was improperly influenced by the evidence of one murder in determining his guilt of the other.

Defendant correctly points out that, because the present matter is "one in which the joinder itself gave rise to the special circumstance allegation (multiple murder, § 190.2, subd. (a)(3)), . . . a higher degree of scrutiny [must] be given the issue of joinder." (*Bradford*, *supra*, 15 Cal.4th at p. 1318.) But the trial court here heard counsel's extensive argument on the issue and carefully scrutinized the evidence. Our review of the record fails to disclose any abuse of discretion by the trial court in denying defendant's motion to sever.

17

Finally, defendant does not show joinder in this matter amounted to a denial of fundamental fairness. " 'A pretrial ruling that was correct when made can be reversed on appeal only if joinder was so grossly unfair as to deny due process.' " (*Hartsch*, *supra*, 49 Cal.4th at p. 494, quoting *Stitely, supra,* 35 Cal.4th at p. 531.) In light of defendant's confessions, the eyewitness identifications of defendant as the perpetrator of each killing, and forensic evidence that corroborated the eyewitnesses' accounts of the murders, joinder of the murder charges did not render defendant's joint trial fundamentally unfair.

## B. Denial of Defendant's Motion for Individual Sequestered Voir Dire of the Prospective Jurors

Defendant contends the trial court's denial of his motion for individual sequestered voir dire violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution. His contention lacks merit.

"In *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80, we stated that, to minimize the potentially prejudicial effects of voir dire conducted in open court, in future capital cases, the portion of the voir dire of each prospective juror involving death qualification should be done individually and in sequestration." (*People v. Avila* (2006) 38 Cal.4th 491, 559 (*Avila*).) On June 5, 1990, the voters adopted Proposition 115, which, among other things, abrogated *Hovey* by adding section 223 of the Code of Civil Procedure, containing a provision stating that " 'where practicable, [voir dire shall] occur in the presence of the other [prospective] jurors in all criminal cases, including death penalty cases.' " (*People v. Slaughter* (2002)

18

27 Cal.4th 1187, 1199 (*Slaughter*).) Because defendant was tried after Code of Civil Procedure section 223 was enacted, that section controls here.[15]

Before trial, defendant moved for individual sequestered voir dire. He asserted a significant possibility of prejudice existed in this case because the circumstances of the murders of two young men would present emotional issues, evidence of gang affiliation and rivalry would be introduced, defendant was a young African-American man, and the nature of the death-qualification process itself was prejudicial. The trial court summarily denied his request for sequestered voir dire, but granted his motion for the use of a questionnaire containing 50 questions drafted by the parties.

Initially, defendant contends that any restriction on individual and sequestered voir dire on death-qualifying issues, including that imposed by Code of Civil Procedure section 223, violates a defendant's rights to an impartial jury, to

---

[15] At the time of defendant's 1998-1999 trial, section 223 of the Code of Civil Procedure provided: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause. [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution." (Added by Prop. 115, approved by voters, Primary Elec. (June 5, 1990).) As amended effective in 2001, that section grants counsel for each party a limited right to examine prospective jurors through direct oral questioning. (Code Civ. Proc., § 223, as amended by Stats. 2000, ch. 192, § 1; see also *People v. Stewart* (2004) 33 Cal.4th 425, 455 & fns. 17 & 18 (*Stewart*).)

19

a reliable death sentence, and to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Consistent with past decisions, we reject this contention. (See, e.g., *People v. Lewis* (2008) 43 Cal.4th 415, 494 (*Lewis*); *Avila*, *supra*, 38 Cal.4th at p. 559; *People v. Vieira* (2005) 35 Cal.4th 264, 287-288 (*Vieira*); *Stitely*, *supra*, 35 Cal.4th 514, 537.)

Defendant next contends the trial court's summary denial of motion did not amount to a reasoned judgment, and thus constitutes an abuse of discretion. "Under Code of Civil Procedure section 223, the question of whether individual, sequestered voir dire should take place is entrusted to the trial court's discretion. [Citations.] Discretion is abused when the questioning is not reasonably sufficient to test prospective jurors for bias or partiality." (*People v. Tafoya* (2007) 42 Cal.4th 147, 168.)

Here, we agree with the People that, although the trial court did not state its reasons for denying defendant's motion for sequestered voir dire, its remarks during voir dire confirm that its denial of the motion reflected careful consideration of the issue and that it properly exercised its discretion. Before the commencement of voir dire, the court explained to the prospective jurors that use of the questionnaires would save about two to three weeks in selecting a jury because it would obviate the need to question them and listen to their answers in open court. The court offered prospective jurors the option to discuss sensitive subjects in private, if needed. In the context of these comments, it is apparent the trial court thoroughly considered the issue and determined group voir dire was adequate. The court's denial of defendant's motion was not outside the bounds of reason.

Defendant additionally contends that group voir dire was not "practicable" within the meaning of Code of Civil Procedure section 223 because prospective jurors were influenced by the responses of others. He observes that, during voir

20

dire, Prospective Juror S.R. expressed in front of other prospective jurors her views that she did not think she could ever vote to impose a death sentence. The trial court dismissed her for these views. Defendant asserts this juror's views suggested to other prospective jurors who favored the death penalty and wished to serve, but feared disqualification based on their pro-death penalty views, that they could avoid dismissal by expressing less support for the death penalty and conveying a willingness to consider both penalties if they served.

"The possibility that prospective jurors may have been answering questions in a manner they believed the trial court wanted to hear," however, "identifies at most potential, rather than actual, bias and is not a basis for reversing a judgment." (*Vieira*, *supra*, 35 Cal.4th at p. 289.) Indeed, the purpose and effect of the "group voir dire" requirement of Code of Civil Procedure section 223 would be obviated if nonsequestered questioning were deemed "[im]practicable" because of the speculative concern that one prospective juror's death penalty responses might influence the responses of others in the venire. It is precisely this premise of *People v. Hovey, supra*, 28 Cal.3d 1, that Proposition 115's adoption of Code of Civil Procedure section 223 was intended to overrule. (*Vieira*, *supra*, at p. 288, citing *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168, 1178.)

Finally, defendant asserts that the group voir dire procedure employed by the trial court was inadequate to identify prospective jurors whose views on the death penalty rendered them partial and unqualified to serve. As a result, he asserts, the court was unable to determine whether any of the prospective jurors who sat on the jury in his case held disqualifying views that impaired their ability to judge him in accordance with the court's instructions. Defendant, however, does not "describe any specific example of how questioning prospective jurors in the presence of other jurors prevented him from uncovering juror bias." (*People v.*

*Navarette* (2003) 30 Cal.4th 458, 490.) Accordingly, defendant has not demonstrated he was prejudiced by the trial court's use of group voir dire.

### C. Excusal of Prospective Jurors for Cause

In *Witherspoon v. Illinois* (1968) 391 U.S. 510 (*Witherspoon*), the United States Supreme Court held that a death sentence cannot be carried out if the jury that imposed or recommended the penalty was selected by excluding prospective jurors for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Witherspoon*, *supra*, 391 U.S. at p. 522.) In *Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*), the high court clarified the standard enunciated in *Witherspoon* and held that a prospective "juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the [prospective] juror is not substantially impaired, removal for cause is impermissible." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9 (*Uttecht*), citing *Witt*, *supra*, at p. 424.) Under *Witt*, a prospective juror is "substantially impaired" and may properly be excused for cause if he or she is unable to follow the trial court's instruction and "conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." (*People v. McWhorter* (2009) 47 Cal.4th 318, 340 (*McWhorter*).)

Defendant contends the trial court erroneously excused Prospective Jurors R.A., J.S., R.G., G.H., and P.F. for cause based on their views regarding the death penalty, in violation of his constitutional rights to a fair and impartial jury, due process, and a reliable verdict under the Sixth, Eighth, and Fourteenth Amendments. He also impliedly claims that the procedure by which the trial court resolved the challenges for cause of these individuals was constitutionally defective. The People argue not only that defendant's claims lack merit but also that defendant has forfeited both procedural and substantive challenges to the

22

excusals of the prospective jurors because his trial counsel either expressly agreed to the procedures or rulings leading to those excusals, or affirmatively acquiesced in them by stating that the defense would "submit" the matters. We reject both of defendant's claims.

At stake here are the important interests of a capital defendant's constitutional right to a fair and impartial penalty trial and the People's expectation of, and entitlement to, finality of capital judgments. Manifestly, our efforts in reconciling these competing interests depend, in significant part, on the fair and orderly administration of our criminal justice system. A fundamental tenet of our system of justice is the well-established principle that a party's failure to assert error or otherwise preserve an issue at trial ordinarily will result in forfeiture of an appeal of that issue. " 'The purpose of the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had.' "[16] (*People v. Walker* (1991) 54 Cal.3d 1013, 1023, quoting *People v. Melton* (1990) 218 Cal.App.3d 1406, 1409.)

In *People v. Velasquez* (1980) 26 Cal.3d 425 (*Velasquez*), this court observed that "[t]he decisions of the United States Supreme Court and of the California courts have unanimously ruled that *Witherspoon* [excusal] error is not

---

[16]   As we stated in *People v. Saunders* (1993) 5 Cal.4th 580: "In this context, the terms 'waiver' and 'forfeiture' have long been used interchangeably. . . . [H]owever: 'Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right." [Citations.]' [Citation.]" (*Id.* at p. 590, fn. 6.) Thus, here, we characterize the issue as whether counsel's failure to object to the excusals at trial forfeited, rather than waived, the issue on appeal.

23

waived by mere failure to object."**17** (*Id*. at p. 443.) There, we adopted the rule that a defendant's failure to object to a *Witherspoon* excusal at trial does not forfeit the issue on appeal (the "no-forfeiture rule "). (*Velasquez*, at p. 443.) This case presents an occasion to reconsider the validity of this rule, and, as we explain below, we conclude that the rule finds no support in either the United States Supreme Court or California decisional law on which it relies. For this reason, and others that we explain in detail below, we abandon our no-forfeiture rule with respect to *Witherspoon*/*Witt* excusal error. In addition, we require, prospectively, counsel (or defendant, if proceeding pro se) to make either a timely objection, or the functional equivalent of an objection (i.e., statement of opposition or disagreement) to the excusal on specific grounds under *Witherspoon*/*Witt* in order to preserve the issue for appeal.

### 1. *The jury selection process and written questionnaire*

At the beginning of the jury selection process, the trial court proposed to pare down the jury pool to a size the courtroom could accommodate by using the questionnaires defendant had requested, and helped to draft, in order to eliminate prospective jurors whose questionnaire responses reflected death penalty views that precluded their service in a capital case. The prosecutor concurred, and defense counsel raised no objection.

Thereafter, during a discussion of the questionnaires, the prosecutor expressed his understanding that the two sides had "agreed on everything." Defense counsel responded, "That's fine, Your Honor."

---

**17** Because our decision in *Velasquez* predated the high court's decision in *Witt*, which, as stated, clarified the *Witherspoon* standard for excusing prospective jurors for cause, our analysis of *Velasquez* below refers to "*Witherspoon*" instead of "*Witherspoon*/*Witt*" excusal error.

The court read 111 completed juror questionnaires, each 21 pages long. The court and counsel then addressed, one by one, certain prospective jurors whom the court had preliminarily identified, by reason of their written responses, as "questionable." During this process, defense counsel expressly stipulated to the excusal of several prospective jurors, based solely on their questionnaire answers. Thereafter, the court and counsel discussed one by one the remaining prospective jurors, and the prosecutor stipulated to the excusals for cause of Prospective Jurors R.A., J.S., R.G., G.H., and P.F. Counsel "submitted" each matter. In addition, with respect to Prospective Jurors R.A. and J.S., defense counsel declined the court's offer to conduct oral voir dire. The court then excused each of these prospective jurors for cause, based solely on their questionnaire responses.

### 2. Discussion

#### a. Forfeiture

Preliminarily, insofar as defendant now claims the wording of the questionnaires was inherently incapable of revealing that a prospective juror was unqualified, his words or conduct during the jury selection proceedings, described above, constituted express agreements or stipulations to the contrary. He therefore has forfeited such a contention.

Turning now to defendant's substantive claims that the excusals of the five prospective jurors were improper under *Witherspoon/Witt*, the People insist defendant forfeited these claims on appeal because counsel expressed no objection, argument, or opposition, but merely "submitted" these matters to the trial court. In a number of our cases (e.g., *People v. Lynch* (2010) 50 Cal.4th 693, 733 (*Lynch*); *People v. Hawthorne* (2009) 46 Cal.4th 67, 82-83; *People v. Schmeck* (2005) 37 Cal.4th 240, 262 (*Schmeck*)), dating back to *Velasquez*, *supra*, 26 Cal.3d 425, we expressed the rule that an appellate challenge to a *Witherspoon*/*Witt* excusal is not forfeited by a failure to object at trial, or even by

25

counsel's affirmative statement to the trial court that the matter is "submitted." Here, by counsel's submission of the matters to the trial court, " 'as a practical matter, he "did not object to the court's excusing the juror, but . . . also refused to stipulate to it." ' [Citation.]" (*Lynch*, *supra*, at p. 733.) Under our precedent, defendant therefore did not forfeit this claim on appeal. (*Ibid*.)

Nevertheless, we take this opportunity to reexamine, for future purposes, our no-forfeiture rule as established in *Velasquez*. As we explain, we conclude *Velasquez* was based on a faulty premise and was wrongly decided. For this and the additional reasons discussed below, we overrule *People v. Velasquez*, *supra*, 26 Cal.3d 425, to the extent it provides that failure to object to a *Witherspoon* excusal at trial does not forfeit the issue on appeal.

"[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' (Fischer et al., Appeals and Writs in Criminal Cases (2d ed. 2000) § 1D.26, pp. 182–183; see also 4 Cal.Jur.3d (1998) Appellate Review, § 175, pp. 233–234.) This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.] [¶] The reasons for the rule are these: ' "In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling of the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' [Citation.]" (*In re Seaton* (2004) 34 Cal.4th 193, 198.)

A careful review of our forfeiture analysis in *Velasquez* reveals that this court established the exception to the objection requirement for *Witherspoon*

excusal error based on the mistaken assumption that post-*Witherspoon* decisions of the high court and this court ruled such error is not forfeited on appeal by failure to object at trial. (*Velasquez, supra*, 26 Cal.3d at p. 443, citing *Maxwell v. Bishop* (1970) 398 U.S. 262 (*Maxwell*); *Boulden v. Holman* (1969) 394 U.S. 478 (*Boulden*); *Wigglesworth v. Ohio* (1971) 403 U.S. 947 (*Wigglesworth*); *Harris v. Texas* (1971) 403 U.S. 947 (*Harris*); *People v. Risenhoover* (1968) 70 Cal.2d 39 (*Risenhoover*); *In re Anderson* (1968) 69 Cal.2d 613 (*Anderson*).)

This court first applied the no-forfeiture rule set forth in *Velasquez* in *People v. Lanphear* (1980) 26 Cal.3d 814, 844-846 (*Lanphear*). We did so citing *Velasquez* as the sole authority for excusing the defendant's failure to object to the *Witherspoon* excusals, and without mention of the majority's rationale for adopting the rule. (*Lanphear, supra*, 26 Cal.3d at p. 844.) In his dissent to the majority's conclusion in *Lanphear*, however, Justice Clark correctly observed that each of the post-*Witherspoon* decisions cited in Justice Tobriner's lead opinion in *Velasquez* in support of the no-forfeiture rule involved trials that had *preceded* the decision in *Witherspoon* (which the high court decided June 3, 1968) and as to which the appellate or habeas corpus proceedings were pending when the opinion was filed. (*Lanphear*, at pp. 844-846 (dis. opn. of Clark, J.), quoting *Velasquez, supra*, 26 Cal.3d at p. 443.) As such, the defendant in each of those cases was entitled to the fully retroactive application of the new *Witherspoon* standards respecting for cause challenges. (*Witherspoon, supra*, 391 U.S. at p. 523, fn. 22.) Either expressly or impliedly, the defendant's failure to object on *Witherspoon* grounds at trial was excused on appeal. (*Lanphear, supra*, 26 Cal.3d at p. 845; see *Maxwell, supra*, 398 U.S. at p. 267; *Boulden, supra*, 394 U.S. at pp. 484-485; *Wigglesworth, supra*, 403 U.S. 947 [judgment reversed and case remanded for further proceedings under *Witherspoon*, citing *Boulden* and *Maxwell*]; *Harris, supra*, 403 U.S. 947 [same]; *Anderson, supra*, 69 Cal.2d at p. 619 [the defendant's

failure to object to the dismissals in his pre-*Witherspoon* trial was expressly excused because *Witherspoon* made a material change in the law]; *Risenhoover*, *supra*, 70 Cal.2d at p. 56 [relying on *Anderson*].) Indeed, because the *Witherspoon* rule had not yet been articulated at the time of the trials in these cases, defense counsel had no occasion to object to dismissals on *Witherspoon* grounds.[18]

As with our jurisprudence (see, e.g., *Avila*, *supra*, 38 Cal.4th at p. 566), decisions of the high court are not authority for issues neither considered nor decided therein. (*Cooper Industries, Inc. v. Aviall Services, Inc.* (2004) 543 U.S. 157, 170 [" 'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.' "], quoting *Webster v. Fall* (1925) 266 U.S. 507, 511.) Because the question of forfeiture in post-*Witherspoon* trials was not decided by *Witherspoon* or any of the post-*Witherspoon* decisions cited by the *Velasquez* majority, the no-forfeiture rule adopted in that case is grounded in neither the law, nor, as we clarify below, the facts of that case.

The United States Supreme Court first discussed the forfeiture issue in the context of *Witherspoon* excusal error in *Witt*. (*Witt*, *supra*, 469 U.S. at p. 431, fn. 11.) There, Justice Rehnquist explained that defense counsel's failure to object to the dismissals of the prospective jurors did not bar federal habeas corpus review. (*Ibid*.) Because the state supreme court did not dispose of the defendant's claim on independent state grounds (e.g., by failure to preserve the issue on appeal) and

---

[18] We observe that our cases decided after *Lanphear* that apply the *Velasquez* no-forfeiture rule have done so without further analysis or examination. (See, e.g., *Schmeck*, *supra*, 37 Cal.4th at p. 262; *People v. Memro* (1995) 11 Cal.4th 786, 818 (*Memro*); *People v. Cox* (1991) 53 Cal.3d 618, 648, fn. 4 (*Cox*), citing *Velasquez*, *supra*, 26 Cal.3d at p. 443.)

28

reached the merits of the claim, the issue was properly before the high court. (*Ibid.*)

Much more recently, the high court elaborated on the forfeiture issue in *Uttecht, supra,* 551 U.S. 1.  The *Uttecht* majority confirmed that for purposes of federal habeas corpus review of *Witherspoon/Witt* excusal error in a state criminal trial, there is "no independent federal requirement" of a trial objection; instead, "*state procedural rules govern.*"  (*Uttecht,* at p. 18, italics added.)  Nonetheless, the *Uttecht* majority noted the federal habeas corpus court may take into account, on the merits, the implications of trial counsel's "voluntary acquiescence to, or confirmation of, a juror's removal."  (*Ibid.*)  As the majority explained, "[b]y failing to object, the defense [does] not just deny the conscientious trial judge an opportunity to explain his judgment or correct any error.  It also deprive[s] reviewing courts of further factual findings that would have helped to explain the court's decision."  (*Ibid.*)  *Uttecht* thus strongly implied that a requirement of trial objection in *Witherspoon/Witt* cases is sound policy, and that the federal Constitution does not bar the adoption of such a "state procedural rule[ ]." (*Uttecht,* at p. 18.)

Ironically, in *Velasquez,* this court *did* embrace this sound policy.  In addition to creating the no-forfeiture rule, the *Velasquez* majority also observed that the trial court in that case was *in fact* apprised of the risk of error in excusing the prospective juror and provided an opportunity to correct the error.  We thus impliedly held that the issue had been preserved for appeal on this additional basis. We stated:  "[I]n the present case the trial judge was alerted to the possibility of *Witherspoon* error by the prosecutor and further was informed that defendants did not consent to the dismissal of [the prospective juror].  [Citation.]  Thus the function of an objection—to alert the court to the risk of error and permit it to avoid that error—was essentially fulfilled.  Furthermore, the court's statement that

29

'I'm going to stand by my ruling.  It's plenty clear to me,' suggests that any formal objection would have been futile."  (*Velasquez*, *supra*, 26 Cal.3d at p. 444; see *id.* at p. 437.)

Because, as indicated, *Velasquez* held in the alternative that the issue was preserved at trial (albeit atypically by both defense counsel *and* the prosecutor), *Velasquez*'s suggestion that *Witherspoon* excusal error is not forfeited by failure to object effectively was dictum.  Insofar as not inherently persuasive, it thus has little authoritative weight.

Finally, our no-forfeiture rule as to *Witherspoon*/*Witt* excusal error is inconsistent with the requirement of an objection that applies to other jury selection issues.  We have repeatedly required that an objection be interposed in the trial court to preserve jury selection issues other than *Witherspoon*/*Witt* excusal error, including inadequate voir dire (*People v. Foster* (2010) 50 Cal.4th 1301, 1324; *People v. Taylor* (2010) 48 Cal.4th 574, 638 (*Taylor*); *People v. Rogers* (2009) 46 Cal.4th 1136, 1149 (*Rogers*); *People v. Cook* (2007) 40 Cal.4th 1334, 1341-1342); failure to instruct prospective jurors regarding their civic duty to serve in a death penalty case (*People v. Mills* (2010) 48 Cal.4th 158, 170); non-*Witherspoon*/*Witt* error in excusing jurors (*People v. Holt* (1997) 15 Cal.4th 619, 656 (*Holt*) [prosecutor's challenge for bias/conflict of interest]; *People v. Mickey* (1991) 54 Cal.3d 612, 664-665 [undue personal hardship]); error in discharging a prospective juror at his or her request (*People v. Ashmus* (1991) 54 Cal.3d 932, 987, fn. 16 [failure to preserve federal constitutional claim]); representative cross-section error (*People v. Ramirez* (2006) 39 Cal.4th 398, 440 [composition of the master jury list]; *People v. Champion* (1995) 9 Cal.4th 879, 907 (*Champion*), overruled on another point in *People v. Combs* (2004) 34 Cal.4th 821, 860 [wage earners systematically excluded]; *People v. Fauber* (1992) 2 Cal.4th 792, 816

[hearing impaired prospective jurors systematically excused]; *Batson*/*Wheeler*[19] error (*People v. Davis* (2009) 46 Cal.4th 539, 583; *Lewis*, *supra*, 43 Cal.4th at pp. 481-482; *People v. Thornton* (2007) 41 Cal.4th 391, 462); and improper denial of a defendant's challenge for cause under *Witherspoon*/*Witt* (*Mills, supra,* at pp. 186-187 [defendant must use peremptory challenge to remove prospective juror in question, must exhaust peremptory challenges, and must express dissatisfaction with the jury as finally constituted]; *People v. Wallace*, *supra*, 44 Cal.4th 1032, 1055 [same]; but cf. *People v. Hoyos* (2007) 41 Cal.4th 872, 904, fn. 16 [explicit nonjoinder in codefendant's challenge for cause to pro-death prospective juror did not forfeit appellate contention that juror was death disqualified "because failure to object does not forfeit a *Witt*/*Witherspoon* claim on appeal"].)[20]

---

[19]  *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

[20]  Our review of decisions from other jurisdictions has disclosed no example of a rule, similar to California's, that uniquely preserves for review, despite the failure to object below, a claim that the record does not support an excusal under *Witherspoon/Witt*.  Indeed, numerous states have held such a claim is forfeited if the defendant did not interpose a trial objection.  (*Clark v. Arkansas* (Ark. 1978) 573 S.W.2d 622, 636-637 [general rule that failure to object at trial or by motion for new trial waived issue on capital appeal applied to defendant's claim of unsupported *Witherspoon* excusal]; *Brown v. State* (Fla. 1980) 381 So.2d 690, 693-694 [defendant could not complain on appeal of unsupported *Witherspoon* excusal where no objection was interposed]; *Blankenship v. State* (Ga. 1988) 365 S.E.2d 265, 267 [failure to object at trial waived defendant's appellate claim of unsupported *Witherspoon/Witt* excusal pursuant to Georgia court rule generally applicable to excusals for cause]; *State v. Campbell* (La. 2008) 983 So.2d 810, 862-864 [where counsel, or defendant personally when representing himself, stated "no objection" to prospective jurors' excusal, statute and case law mandated forfeiture for failure to make contemporaneous objection]; *Scott v. State* (Miss 2006) 938 So.2d 1233, 1247 [failure to object at trial or on appeal forfeited issue under statute governing collateral postconviction relief], overruled on another point, in *Lynch v. State* (Miss. 2007) 951 So.2d 549; *White v. State* (Miss. 1988) 532 So.2d 1207, 1215 [failure to object at trial forfeited issue on direct appeal];

*(Footnote continued on next page.)*

31

*Commonwealth v. Ligons* (Pa. 2009) 971 A.2d 1125, 1155 [lack of contemporaneous trial objection resulted in forfeiture under statute governing collateral postconviction relief]; *Hodges v. Commonwealth* (Va. 1972) 191 S.E.2d 794, 795 [general objection to excusal of prospective jurors for cause held insufficient to preserve *Witherspoon* claim on appeal]; but cf. *Carter v. State* (Tex. Crim.App. 1986) 717 S.W.2d 60, 76 [failure to state specific grounds of objection did not constitute waiver where context made it obvious to court that objection was on grounds the record did not support prospective juror's death disqualification, and no one was misled].)

We have found several decisions indicating that a failure to object below did not bar limited review of a *Witherspoon/Witt* excusal issue, but these cases arose in jurisdictions which, unlike California, recognized, as a matter of local practice, some more general "plain error" or "fundamental error" exception to the rule requiring a trial objection. (E.g., *State v. Detrich* (Ariz. 1997) 932 P.2d 1328, 1336 [while claim of erroneous individual *Witherspoon*/*Witt* excusal was waived by failure to object on this specific ground, circumstances of excusal would nonetheless be examined, under general state practice governing criminal appeals, for fundamental error]; *People v. Gacho* (Ill. 1988) 522 N.E.2d 1146, 1154-1155 [*Witherspoon*/*Witt* excusal claim would be considered under state rule calling for "plain error" review of capital penalty issues otherwise waived by failing to object in cases where evidence is closely balanced]; *State v. Keith* (Ohio 1997) 684 N.E.2d 47, 56 [the absence of an objection did not preclude appellate review for plain error of defendant's claim of erroneous *Witherspoon*/*Witt* excusal], but see *State v. Bethel* (Ohio 2006) 854 N.E.2d 150, 174-175 [despite general rule that, regardless of objection, record in criminal case will be reviewed for plain error affecting defendant's substantial rights (see, e.g., *State v. Barnes* (Ohio 2002) 759 N.E.2d 1240, 1246-1247), claim of unsupported *Witherspoon/Witt* excusal was waived by failure to object on this specific ground]; see also *Douglas v. State* (Okla.Crim.App. 1997) 951 P.2d 651, 660 [by failure to object that prospective jurors should not have been excused on *Witherspoon/Witt* grounds absent a motion by the state, defendant waived all but plain error, and no such error occurred]; (*State v. McDougald* (N.J. 1990) 577 A.2d 419, 436 [despite lack of objection below, "reverse *Witherspoon*" claim that pro-death juror should have been excused would be addressed pursuant to state rule requiring "plain error" review of capital sentencing issues affecting right to fair and impartial jury], and see also *State v. Biegenwald* (N.J. 1987) 524 A.2d 130, 166 ["plain error" doctrine applies where "life is at stake" and error was likely to affect defendant's substantial rights].)

By applying to *Witherspoon*/*Witt* issues the usual requirement of a contemporaneous objection, we promote fair and orderly judicial administration. A timely objection alerts the trial court to potential *Witherspoon*/*Witt* error in the disqualification of a prospective juror, thus enabling the court to avoid or correct the problem before it irrevocably nullifies the entire subsequent penalty trial.[21] Moreover, by requiring the defendant to advise the trial court he or she opposes the excusal under *Witherspoon*/*Witt* in order to preserve the issue for appeal, we eliminate the unfair risk of "sandbagging" the court by finding it committed reversible error of which it received no warning. Defendant offers no persuasive reason why our requirement of a contemporaneous objection stating specific grounds of *Witherspoon/Witt* excusal error should not apply.

Accordingly, for the reasons stated, we overrule *People v. Velasquez*, *supra*, 26 Cal.3d 425 to the extent it articulates a no-forfeiture rule with respect to *Witherspoon*/*Witt* excusal error. In any capital case tried after the finality of this decision, counsel (or defendant, if proceeding pro se) must make either a timely objection, or the functional equivalent of an objection, such as a statement of opposition or disagreement, to the excusal stating specific grounds under *Witherspoon*/*Witt* in order to preserve the issue for appeal. Nevertheless, as stated above, because at the time of this trial we had not expressly held that an objection is necessary to preserve *Witherspoon/Witt* excusal error on appeal, we do not apply this rule here. (See *People v. Scott* (1994) 9 Cal.4th 331, 357-358.) We thus proceed to the merits of defendant's claims.

---

[21]     As noted below, the erroneous excusal of a prospective juror under *Witherspoon*/*Witt* requires reversal of a death penalty judgment. (*Gray v. Mississippi* (1987) 481 U.S. 648, 666-668.)

*b. The law*

A "criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." (*Uttecht*, *supra*, 551 U.S. at p. 9, citing *Witherspoon*, *supra*, 391 U.S. at p. 521.) As stated, a prospective juror in a capital case may be excused if his or her views would " 'prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his [or her] oath.' " (*Witt*, *supra*, 469 U.S. at p. 424.) A prospective juror's bias against the death penalty, however, need not be proved with "unmistakable clarity." (*McWhorter*, *supra*, 47 Cal.4th at p. 340.) Moreover, "a prospective juror in a capital case may be discharged for cause based solely on his or her answers to the written questionnaire if it is *clear* from the answers that he or she is unwilling to temporarily set aside his or her own beliefs and follow the law." (*Avila, supra*, 38 Cal.4th at p. 531, italics added; accord, *People v. Wilson* (2008) 44 Cal.4th 758, 787 (*Wilson*).)

The erroneous exclusion of a prospective juror under *Witherspoon/Witt* compels reversal of the penalty verdict regardless of whether the prosecutor had remaining peremptory challenges. (*People v. Heard* (2003) 31 Cal.4th 946, 965; see *Gray v. Mississippi*, *supra*, 481 U.S. at pp. 666-668.) On appeal, we independently review a trial court's decision to excuse for cause a prospective juror based solely upon that juror's written responses to a questionnaire. (*People v. Russell* (2010) 50 Cal.4th 1228, 1261 (*Russell*), citing *Avila*, *supra*, 38 Cal.4th at p. 529.)

In addition to applying the above standards, we find the following principles also are helpful in analyzing the instant trial court's decision to excuse the prospective jurors for cause.

As we have held in a number of our decisions, even if counsel's failure to object does not technically forfeit an appellate challenge to a *Witherspoon/Witt*

excusal, it does indicate counsel acquiesced and concurred that the juror could be excused. (*Lynch*, *supra*, 50 Cal.4th at p. 733; *Schmeck*, *supra*, 37 Cal.4th at p. 262; *People v. Cleveland* (2004) 32 Cal.4th 704, 734-735; *Memro*, *supra*, 11 Cal.4th at p. 818; *Cox*, *supra*, 53 Cal.3d at p. 648, fn. 4; see *Uttecht*, *supra*, 551 U.S. at p. 18.) Such an inference is reinforced when, faced with a tentative ruling that the prospective juror is excusable, as here, counsel passed up an opportunity to question the juror further, or declined a direct offer of further voir dire. (*Witt*, *supra*, 469 U.S. at pp. 430-431 [noting, as factor supporting excusal of the prospective juror, that "defense counsel did not see fit to object to [the prospective juror]'s recusal, or to attempt rehabilitation"]; *id*., at pp. 434-435 [noting again that defense counsel chose not to question the prospective juror or object to her excusal, and that "[i]ndeed . . . it seems that at the time [she] was excused no one in the courtroom questioned the fact that her beliefs prevented her from sitting"]; see also *id.*, at p. 431, fn. 11 [where state supreme court did not find waiver for failure to object, claim will not be deemed " 'waived' " on federal habeas corpus, but "counsel's failure to speak in a situation later claimed to be so rife with ambiguity as to constitute constitutional error is a circumstance we feel justified in considering when assessing respondent's claims"]; cf. *Stewart*, *supra*, 33 Cal.4th 425, 440, 452 [stressing that counsel repeatedly objected to the excusals, based exclusively on their questionnaire responses, of all five prospective jurors there at issue and despite prior promises by the court was denied all opportunity for follow-up questioning].)

When counsel failed to openly contest an excusal, we may logically assume counsel did not oppose it. It is equally logical to assume that when, having been advised of the court's intention to excuse a prospective juror, counsel declined an opportunity for further voir dire to clarify the juror's views, counsel accepted that the record as it stood was sufficient to support the intended ruling. These

35

assumptions also take into account that there may be subjective reasons why, exercising the lawyer's art and instinct, counsel would prefer to dispense with a particular juror despite the juror's pro-life views.  Additionally, they discourage counsel from seeking to create "built-in error" by forcing the trial court to rule, without guidance, on a record counsel hopes will later be found inadequate.  (See *Uttecht*, *supra*, 551 U.S. at p. 18.)

### c.  The merits

As we explain below, we conclude that all of defendant's *Witherspoon/Witt* claims lack merit.

### (1)  Challenge to the adequacy of the questionnaire

Initially, defendant contends the jury questionnaire was defective because none of the questions "directly address[ed] the pertinent constitutional issue" in *Witt*—i.e., whether the prospective juror could temporarily set aside his or her personal beliefs and follow the court's instructions in determining penalty.  (See *Stewart*, *supra*, 33 Cal.4th at p. 447.)  As explained above, defendant forfeited this claim by expressing agreement in the trial court with the form of the questionnaire. In any event, his argument lacks merit.

In *Stewart*, we held that "the trial court erred by excusing for cause five prospective jurors based upon their [written] answers to a jury questionnaire that asked whether the prospective juror's views on the death penalty would prevent or make it very difficult for him or her to impose the penalty."  (*Russell*, *supra*, 50 Cal.4th at p. 1261, citing *Stewart*, *supra*, 33 Cal.4th at pp. 442, 444-445; *Avila*, *supra,* 38 Cal.4th at p. 530.)  The "make it very difficult" language in the *Stewart* questionnaire precluded the trial court from ascertaining "whether a juror's response supported disqualification under the *Wainwright v. Witt* standard requiring that such person's views on the death penalty would prevent or substantially impair that person's ability to perform his or her duties.  (*People v.*

*Stewart*, *supra*, 33 Cal.4th at pp. 444-445; *Wainwright v. Witt*, *supra*, 469 U.S. at p. 424.)" (*Russell*, *supra*, at p. 1261.) That is not the case here.

Question No. 46 directly asked prospective jurors whether they would "always" vote for either life or death.[22] The wording of this particular question is equivalent to that which we approved in *Avila*, *supra*, 38 Cal.4th at page 531, and fully enabled the trial judge to ascertain whether a prospective juror was "substantially impaired" within the meaning of *Witt*. (See *Wilson*, *supra*, 44 Cal.4th at p. 787.) In addition, unlike in *Stewart*, the questionnaire as a whole included "expansive and detailed questions on capital punishment and gave jurors the clear opportunity to disclose views against it so strong as to disqualify them for duty on a death penalty case." (*Avila, supra*, 38 Cal.4th at p. 531; see *Russell*, *supra*, 50 Cal.4th at p. 94.)

As defendant observes, the questionnaire also inquired whether prospective jurors would have "difficulty" in voting to impose the death penalty. Inclusion of such a question, however, does not necessarily render a questionnaire inadequate

---

**22** Question No. 46 read as follows: "It is important that you have the ability to approach this case with an open mind and a willingness to fairly consider whatever evidence is presented as opposed to having such strongly held opinions that you would be unable to fairly consider all the evidence presented during the penalty phase. [¶] There are no circumstances under which a jury is instructed by the court that they must return a verdict of death. No matter what the evidence shows, the jury is always given the option in a penalty phase of choosing life without the possibility of parole. Assuming a defendant was convicted of a special circumstance murder, would you:

        __ a. No matter what the evidence was, ALWAYS vote for the death penalty.

        __ b. No matter what the evidence was, ALWAYS vote for life without possibility of parole.

        __ c. I would consider all of the evidence and the jury instructions as provided by the court and impose the penalty I personally feel is appropriate."

37

to screen for disqualified prospective jurors, provided other questions are framed in such a way as to elicit the information necessary for a proper excusal under *Witt*.  (See *Wilson*, *supra*, 44 Cal.4th at p. 789.)  In any event, the trial judge did not excuse the challenged prospective jurors based solely on their answers to question No. 46.  We find no basis to conclude that the questionnaire was inherently inadequate.

### (2)  Challenges for cause

Defendant urges that the questionnaire responses of Prospective Jurors R.A., J.S., R.G., G.H., and P.F. did not clearly establish bases for their excusals under *Witherspoon*/*Witt*.  We disagree.  Based on our independent review of the record, the questionnaire responses of each of these prospective jurors, taken together, make it clear that he or she was substantially impaired within the meaning of *Witt* and thus, unable to serve as a capital juror.

### (a)  Prospective Juror R.A.

As discussed above, *Witt* held that a prospective juror may be excluded for cause from a capital case if the juror's views on capital punishment would "prevent or substantially impair" the performance of his or her duties in accordance with the juror's oath and the court's instructions.  (*Witt*, *supra*, 469 U.S. 412, 424.)  In *Witt*, the court thus retracted and nullified any inference from its prior decision in *Witherspoon* that a prospective juror may be excluded for cause from a capital trial, on grounds of capital penalty bias, only by indicating with "unmistakable clarity" that he or she would "automatically" vote for or against a judgment of death.  (*Ibid.*)  The high court has specified, however, that prospective jurors cannot be disqualified merely for expressing strong views against the death penalty.  They may serve "so long as they state *clearly* that they are willing to temporarily set aside their own beliefs in deference to the rule of law."  (*Lockhart v. McCree* (1986) 476 U.S. 162, 176, italics added.)

In several recent cases, we have addressed the circumstances in which the trial court may excuse a prospective juror solely on the basis of answers to a written questionnaire, without observing the prospective juror's demeanor under oral examination in open court. Such an excusal is permitted if the questionnaire affords "sufficient information regarding the prospective juror's state of mind to permit a reliable determination" whether the juror's views would " ' "prevent or substantially impair" ' the performance of his or her duties . . . ." (*Stewart*, *supra*, 33 Cal.4th 425, 445.) Thus, we have held that a prospective juror may be disqualified on his or her questionnaire responses alone "if it is clear from the answers that he or she is unwilling to temporarily set aside his or her own beliefs and follow the law." (*Avila*, *supra*, 38 Cal.4th at p. 531; see *Russell*, *supra*, 50 Cal.4th at p. 1262 [same]; accord, *Wilson*, *supra*, 44 Cal.4th at p. 787 [excusal on questionnaire answers alone "is permissible if, from those responses, it is clear (and 'leave[s] no doubt') that [the] prospective juror's views about the death penalty would satisfy the *Witt* standard [citation] and that the juror is not willing *or able* to set aside his or her personal views and follow the law," italics added]; *People v. Thompson* (2010) 49 Cal.4th 79, 97 [same].) As stated above, where the trial court ruled on the questionnaire alone, we review its determination de novo, without affording the deference that would apply had the court observed the prospective juror in person. (*Avila*, *supra*, at p. 529.)

Importantly, neither we nor the high court has asserted that *any* statement—however unconvincing or ambiguous—by a prospective juror of willingness to apply the law despite strong death penalty views bars the juror's excusal, even if other statements by the prospective juror clearly demonstrate that he or she cannot do so. We have been careful to note that, even when an excusal was based on questionnaire responses alone, the excusal may be upheld if those answers, "taken together," clearly demonstrate the juror's unwillingness or

39

inability, because of attitudes about the death penalty, to perform his or her duties in a capital trial. (*Avila*, *supra*, 38 Cal.4th at p. 533.)

Moreover, while we have said that written questionnaire responses *do* justify excusal if those responses leave no doubt the prospective juror cannot or will not act fairly in a capital case, we have not held the converse — that the questionnaire responses will support excusal *only* if those responses establish beyond *all possible or theoretical* doubt that the juror cannot apply the law and instructions, or follow the juror's oath, in a capital case. As *Witt* suggested, often *no* process for assessing juror qualifications, written or oral, can achieve such an exacting level of certainty. (*Witt*, *supra*, 469 U.S. at pp. 424-425.)

In *Stewart*, we confirmed that, even where the trial court considers only a prospective juror's written questionnaire responses, it may excuse the juror if it has "*sufficient* information . . . to permit a *reliable* determination" that the juror's death penalty views "would ' "prevent or substantially impair" ' the performance of his or her duties (as defined by the court's instructions and the juror's oath) . . . ." (*Stewart*, *supra*, 33 Cal.4th at p. 445, italics added.) This standard is, of course, quite exacting when the trial court did not observe the juror's personal demeanor. Still, follow-up questioning for purposes of clarification and personal observation should not be essential to a proper excusal when the record, as it stands, makes it clear that the juror is disqualified.[23]

---

[23] While we have cautioned against overreliance on written questionnaires in an attempt to streamline the juror selection process (*Wilson*, *supra*, 44 Cal.4th 758, 790; *Avila*, *supra*, 38 Cal.4th 491, 529-530, fn. 25), we have indicated our "appreciat[ion]" for trial courts' "laudatory" efforts to make the "long and tedious business" of juror selection more efficient (*Wilson*, *supra*, at p. 790; see *Avila*, *supra*, at p. 530, fn. 25). As stated, the appellate record in this case includes 111 completed juror questionnaires, each 21 pages long, and comments by the trial court give the impression that 140 or more prospective jurors may have filled out questionnaires. Records filed in this court for other death penalty appeals suggest

*(Footnote continued on next page.)*

If our de novo review of a "written questionnaire" excusal reveals that the prospective juror's pro forma statement of willingness to apply the law—particularly when that statement was itself ambiguous—was flatly negated by other clear indications on the whole record that the juror could not be fair, the juror's excusal under *Witt* may be upheld. In such a case—and especially where trial counsel specifically declined to contest the court's ruling and turned down an offer of further voir dire—we may conclude the trial court had "sufficient information . . . to permit a reliable determination" the prospective juror was unqualified. (*Stewart*, *supra*, 33 Cal.4th 425, 445.) That is the situation here.

R.A.'s questionnaire responses are replete with indications that he was vehemently and unalterably opposed to capital punishment. Asked to describe his general feelings about the death penalty, R.A. responded, "I don't agree with it. I think the state shouldn't take a life nor do I think an individual should take another's life." Asked why he felt that way, R.A. answered, "It's wrong to kill people." Asked whether his views would make it difficult to vote for the death penalty "in this case, regardless of what the evidence was," R.A. responded, "I think it would be hard to vote for the death penalty under any condition." R.A. further stated he believed the purpose of the death penalty was "punishment *and revenge*." (Italics added.)

---

*(Footnote continued from previous page.)*

that jury selection in such matters typically requires the filtering of a similar or greater volume of prospective jurors. These realities make it understandable, and necessary, that overburdened trial courts should employ fair and balanced means to reduce the time and resources devoted to this process. Such efforts should not be discouraged by the imposition of overstringent standards for excusals on the basis of written questionnaire responses.

A separate inquiry on the questionnaire particularly highlighted the intensity of R.A.'s attitudes. Asked to rate the strength of his views on a scale of 1 to 10, with 1 representing the strongest opposition to the death penalty and 10 representing the strongest support for it (the 1 to 10 scale), R.A. rated himself a "1."[24]

With respect to question No. 46, quoted above, R.A. marked "c," indicating that he would "*consider* all the evidence and the jury instructions as provided by the court and impose the penalty *I personally feel is appropriate*." (Italics added.) But this response hardly constituted a clear and unqualified statement of R.A.'s willingness and ability, despite his opposition to capital punishment, to apply the law and evaluate the penalty choices fairly. R.A.'s response could plausibly have conveyed only his understanding that, after "consider[ing]" the evidence and instructions, he was free to impose the penalty he "personally [felt] [was] appropriate." In light of R.A.'s intense anti-death-penalty views, it is difficult to see how he could "personally feel" the death penalty was "appropriate" in any case. The trial court could properly conclude that R.A.'s answer to question No. 46 did not overcome what were otherwise uniform and clear statements of implacable resistance to imposing a judgment of death. Indeed, when viewed together, R.A.'s answers, including his response to question No. 46, clearly

---

**24**    Asked how, if at all, his views about the death penalty had changed over time, R.A. did state that "I have basically become more passive due to life's experiences." But this statement, suggesting only that R.A.'s opposition to the death penalty did not dominate this stage of his day-to-day life, did not imply that he would remain "passive" on the issue once confronted with direct responsibility for deciding whether to put someone to death. His other responses strongly indicated otherwise.

demonstrate that, because of his views on capital punishment, he was unable to deliberate fairly on the issue of penalty.**25**

Most telling is defense counsel's reaction when the court asked what counsel would "like to do" about R.A. Defendant's attorney first replied, "We'd submit it, Your Honor." The following colloquy then occurred: "THE COURT: Do you want further voir dire? Tentatively based on [R.A.'s] answers, I would rule that he's impaired, substantially impaired. If you want further voir dire, I will." [¶] MR. MACHER [defense counsel]: No, Your Honor." By these actions, counsel signaled concurrence in R.A.'s excusal solely on the basis of his questionnaire answers. Even if counsel's conduct did not forfeit, at the procedural threshold, an appellate challenge to the excusal, it thus weighs heavily, along with the substance of R.A.'s questionnaire responses, in favor of a determination on the merits that the excusal was proper.

---

**25** The concurring and dissenting opinion asserts that we find R.A.'s excusal proper, in part, because his answer to question No. 46 did not make it clear he would set aside his personal views on the death penalty and apply the law in deciding penalty. But we do not so hold. On the contrary, we are satisfied that, when his response to that question is considered with all of his other responses, these responses, "taken together," make it clear he could *not* fairly consider the question of penalty.

The concurring and dissenting opinion also suggests that insofar as question No. 46 allowed R.A.'s ambiguous answer, the question itself was defective. Not so. Question No. 46 gave prospective jurors every opportunity to indicate that they would automatically vote for life or death. (Cf. *Stewart, supra*, 33 Cal.4th at pp. 446-447 [question whether a prospective juror's views on capital punishment "would *either* 'prevent or make it very difficult' for the prospective juror 'to ever vote to impose the death penalty' " did not allow for determination of disqualification under *Witt*].) That question No. 46 provided for a third response—and that R.A. chose this response—does not make the questionnaire defective. And where this answer, "taken together" with R.A.'s other responses, made it clear that R.A. was unable to follow the law and fairly deliberate penalty, a finding of disqualification was proper without the need to conduct further voir dire.

The record as a whole thus allowed a reliable determination, and clearly established, that R.A. could not fairly discharge the duties of a capital juror. The trial court did not err in excusing him.

### (b) Prospective Juror J.S.

Similarly, the record as a whole clearly established that Prospective Juror J.S. was disqualified from service under *Witt*. Like R.A, J.S. expressed no support for the death penalty in his questionnaire responses, and instead, communicated clear, unwavering opposition to this penalty option. J.S. stated that he did not "think another human has the right to determine another[']s death" and flatly declared he was "not in favor of the death penalty." Moreover, J.S. believed that he could not be a fair and impartial capital juror in this case because he did not "agree with the death penalty." Indeed, J.S. stated that he "never ha[d] agreed with it." Consistent with his strong anti-death-penalty attitudes, J.S., like R.A., ranked himself a "1" on the 1 to 10 scale, indicating the strongest opposition to the death penalty. Further, J.S. indicated that because he "couldn't agree to put another person to death," deciding the question of penalty would always be difficult for him, regardless of what the evidence presented.

J.S., like R.A., checked option "c" in response to question No. 46, stating his willingness to "consider" the evidence and instructions and impose the penalty he "personally feel[s] is appropriate." But this ambiguous response may have implied his understanding that, after such consider[ation]," his personal preference could still prevail. It did not overcome J.S.'s otherwise consistent declarations suggesting he "couldn't agree" to participate in a death judgment.

Finally, as with R.A., counsel failed to express any opposition to J.S.'s excusal, merely "submit[ting]" the issue. Moreover, when the court indicated its

44

inclination to excuse J.S., but offered further voir dire, counsel declined.[26] This conduct, though not a technical forfeiture, demonstrated counsel's acquiescence and concurrence that the record, as it stood, supported J.S.'s excusal. (*Lynch*, *supra*, 50 Cal.4th at p. 733; *Schmeck*, *supra*, 37 Cal.4th at p. 262.) Together with the substance of J.S.'s questionnaire answers, counsel's conduct weighs strongly in favor of a determination that the excusal of this prospective juror was proper. It is clear from J.S.'s questionnaire responses, taken together, that J.S. could not set aside his views about the death penalty and perform the duties of a capital juror. (See *Witt*, *supra*, 469 U.S. at pp. 430-431; *Avila*, *supra*, 38 Cal.4th at p. 530.) Accordingly, the trial court did not err by excusing him.

### (c) Prospective Juror R.G.

The record on a whole reflects that Prospective Juror R.G. indicated that his clear opposition to the death penalty rendered him unable to serve as a capital juror. Although R.G. indicated his general willingness to follow the law if his personal feelings conflicted with the court's instructions, when asked specifically about his ability to be impartial in deciding whether to impose a death sentence, however, R.G. responded negatively. That is, he selected option "b" in answer to question No. 46, quoted above, vowing to always vote for a penalty of life without possibility of parole if guided by his personal feelings, regardless of what the evidence showed. R.G.'s personal expressions confirmed his resolve to never

---

**26** With respect to J.S., the following colloquy between court and counsel occurred: "THE COURT: [J.S.] [i]ndicates, 'Don't think another human has the right to determine another's death. Couldn't agree to put another person to death. Not in favor of the death penalty.' [¶] Indicates ─ but he does indicate under [question No. 46] ['c'] that he would consider all the evidence. [¶] So I'll submit it to the defense. Do you want further voir dire? [¶] MR. MACHER [defense counsel]: Your Honor, we would submit on that one. [¶] THE COURT: No further voir dire? [¶] MR. MACHER: Correct, Your Honor. [¶] THE COURT: All right. The Court finds he's substantially impaired based upon his answers."

impose the death penalty. R.G. described his general feelings about the death penalty in simple, unambiguous terms: "Thou shal[l] not kill," explaining that "man is not God." Also, R.G. believed that "[n]o one has the right to kill another human being as despicable as that person might be." In expressing his opinion about the death penalty in practical terms, R.G. stated the death penalty "only serves to sell newspapers" and was ineffective as punishment.

In sum, R.G.'s questionnaire responses, taken together, make it clear that he was unable to set aside his views on the death penalty, follow the law and the trial court's instructions, and fairly consider the death penalty. Our conclusion is not altered by R.G.'s self-rating as a 10 on the 1 to 10 scale described above, indicating he strongly favored the death penalty. None of his responses to any of the other questions on the questionnaire that solicited his personal views on the death penalty reflected this similar level of support. The trial court properly excused R.G. for cause.

### (d) Prospective Juror G.H.

With respect to Prospective Juror G.H., we conclude that her answers to the questionnaire clearly indicated that she could not fulfill the duties of a capital juror. Although G.H. expressed a general willingness to follow the trial court's instructions in spite of any personal feelings or beliefs to the contrary, she also exhibited unyielding general opposition to the death penalty based on her religious and moral beliefs and stated she would always vote for a life sentence, regardless of the evidence. G.H. expressed her stance against the death penalty as follows: "Only God has the right to take a life"; "The more I study the word of God, I find it more difficult to put someone else in a position to die"; "No one is to take a life"; and "When one believes that God created us to follow him and Jesus by faith—it would be difficult to follow man's law." Seemingly contradictory to these sentiments is the rating she gave herself, an 8, on the 1 to 10 scale described

46

above, indicating she was moderately in favor of the death penalty. When asked to explain this rating, however, she stated that this level of support was essentially reserved for the situation, unlike here, where "[the victim] was my family member" because "it would be difficult not wanting that person [i.e., the killer] to suffer." Such sentiment, though, does not dilute the otherwise clear impression from G.H.'s questionnaire responses that she was otherwise patently opposed to the death penalty. Taken together, G.H.'s questionnaire answers make it clear that she would be unable to set aside her religious and moral convictions against the death penalty and follow the law in determining penalty. The trial court properly dismissed her for cause.

### *(e) Prospective Juror P.F.*

Prospective Juror P.F.'s questionnaire responses, taken together, reflected intense opposition against the death penalty that permitted a reliable determination that he was unable to fairly consider the evidence and adhere to the trial court's instructions in determining penalty. Preliminarily, we note P.F. stated that, in general, he would have difficulty sitting in judgment of another individual because he was unable to be impartial in light of his religious or moral beliefs. On the other hand, when he expressed his views specifically regarding the death penalty, P.F. gave the clear impression that he would experience no difficulty resolving the question of punishment always in favor of a life sentence. When asked to rank his level of support for the death penalty, he marked 1 on the 1 to 10 scale, meaning he strongly opposed penalty, because he believed "it is wrong to take a life." Although P.F. indicated his general willingness to follow the law in spite of any personal feelings that might conflict with the court's instructions, his response to question No. 46, "b," clearly indicated his unwillingness to disregard his firm opposition to the death penalty in order to fairly consider the question of penalty. No matter what the evidence established, P.F. indicated that he would always vote

47

for life without the possibility of parole.  Thus, P.F.'s questionnaire responses clearly demonstrate that he was disqualified from service under *Witt*.  P.F. was properly excused for cause.

## III.  GUILT PHASE ISSUES

### A.  Admission of Gang Evidence

Defendant contends on multiple grounds that the trial court erroneously admitted gang evidence offered in support of the prosecution's theory that the Martin murder was gang motivated.  Initially, he asserts that the gang evidence was irrelevant to the joined murder charges and that, under Evidence Code section 352, its probative value was substantially outweighed by a risk the jury would infer from this evidence his criminal disposition to commit the charged murders.  In addition, defendant contends that the evidence was excludable on grounds of hearsay and lack of foundation.  As we explain below, we conclude that the gang evidence was properly admitted.

#### 1.  Procedural background and preservation of issues

Pretrial, the defense moved to exclude "any and all evidence of gang membership and activities of the defendant" as irrelevant and unduly prejudicial under Evidence Code section 352, and asked the trial court to read the preliminary hearing transcript in anticipation of the hearing on the motion.  The prosecutor made an offer of proof, based solely on the preliminary hearing testimony of jailhouse informant Harold Black, that defendant was a member of the Crips street gang and killed Martin, purportedly a member of the Bloods gang, in retaliation for a Blood having killed a purported fellow Crip (Scotty Ware) more than a year before the Martin murder.  Denying the defense motion, the trial court ruled that the evidence was relevant to the Martin murder and that its admission would not deny defendant due process.

48

At trial, the prosecutor presented evidence in support of its theory that Martin's murder was gang motivated through the testimony of Kerry Scott, Harold Black, and Sergeant Palmer. Defendant objected to Scott's testimony on grounds of relevance, lack of foundation, hearsay, and undue prejudice. In overruling defendant's objections, the trial court indicated generally it would permit this type of evidence. Defendant thereafter did not object on these grounds to similar evidence conveyed through Black's and Palmer's testimony.

Defendant acknowledges that he did not object to Black's testimony but asserts any objections would have been futile and would only have reinforced the incompetent evidence in the minds of the jurors. We have reviewed the record and agree that any objections to Black's testimony based on grounds similar to those upon which he objected to Scott's testimony would have been equally unsuccessful. Defendant, therefore, is excused from having failed to object to the admission of Black's testimony regarding defendant's purported gang membership and gang activities in Banning. (See, e.g., *People v. Hill* (1998) 17 Cal.4th 800, 821 [a defendant is excused from making a timely objection to asserted prosecutorial misconduct or a request for admonition if either would be futile]; *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1365, & fn. 8 [where counsel's hearsay objection was overruled as to one statement, same objection to similar statements was unnecessary and, hence, the failure to object to the latter statement did not waive the asserted error for appeal].)

### 2. *Gang evidence*

Kerry Scott testified that he was a member of the "94 Street Swamp" Bloods gang out of Los Angeles in 1994 and had relatives who were members of the Crips gang. He frequently talked with people in the parks in East Banning

and, based on these conversations, learned who was a gang member and what particular gang set each claimed.[27] Scott went to Banning High School with defendant and saw him "all the time on the streets of Banning." Scott knew defendant claimed the Crips gang based on defendant's "gang signs" and his "Grape Street Watts" tattoo, which referred to a Crips gang in Los Angeles. Scott had spoken with Ware, who claimed to be a Crip. Scott testified that "the word out on the street was Scotty Ware was killed by a Blood," and that he had talked to members of the Bloods and the Crips about Ware's death. Scott stated that Ware was killed before Martin's murder.

Black testified he was acquainted with, but not a "close friend" of, defendant, and occasionally saw him in Banning. Within a few weeks after Martin's murder, he and defendant were incarcerated in the same dormitory in Chino State Prison and, during a conversation, defendant confessed he had killed Martin. Defendant told Black that, on the day before Martin's murder, he visited a friend at the Meadowbrook Apartments. He saw Martin the next morning in the parking lot, and "creeped up on him," pointed his gun at Martin, said, "This is for Scotty," and then shot him in the head. Before this conversation, Black had learned of Martin's death through either a phone conversation or a letter he had received in prison. In addition, Black testified that "[Ware] was a Crip, and [Martin] was a Blood" and that Ware was "killed at a party, supposedly by a member of the Blood[s] gang."

Sergeant Palmer testified that he had personally interviewed about 100 gang members in Banning about "various gang things," including who was in a

---

[27]    To "claim" a gang is synonymous with declaring membership in, or allegiance to, a gang.

50

gang and the particular gang he or she claimed. He stated it was common knowledge that Martin was a Blood and that defendant was a Crip. Palmer was aware of the homicide of a person known as Scotty Ware that occurred in Banning, though Palmer was not the investigator on that case.

### 3. Discussion

In general, "[t]he People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.) "[E]ven where gang membership is relevant," however, "because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it." (*People v. Williams* (1997) 16 Cal.4th 153, 193, citing *Champion*, *supra*, 9 Cal.4th at p. 922.) On the other hand, " '[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citation.]" (*Gonzalez*, *supra*, 126 Cal.App.4th at p. 1550.) On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible. (*Williams*, *supra*, 16 Cal.4th at p. 197.)

Here, the gang evidence was properly admitted. In attempting to establish defendant's motive and intent for simply walking up to Martin and shooting him, the prosecution was entitled to give context to defendant's statement to Black that, just before he killed Martin, he told Martin, "This is for Scotty." As noted, Palmer testified, based on his professional understanding of Banning gangs, that defendant was a Crip and Martin was a member of a rival gang, the Bloods; Palmer indicated this was common knowledge within the Banning gang culture. According to Kerry Scott, the "word on the street" was that, some time prior to Martin's murder, Ware, a Crip, had been killed by a Blood. Palmer confirmed that a "Scotty Ware"

51

had been the victim of a homicide in Banning. The jury was entitled to infer from this evidence that when defendant, a Crip, shot Martin, a Blood, "for Scotty," he was acting in retaliation for Ware's murder, which he thought had been committed by a Blood.

Defendant insists there was no adequate foundation, beyond inadmissible hearsay, for the premise that Ware was a Crip who had been killed by a Blood. It is true that the information supplied by Kerry Scott and Harold Black about Ware's murder, and its gang implications, was apparently based on rumor and gossip. But the purpose of testimony about the "word on the street" concerning the murder of "Scotty Ware" was not to establish that this street gossip was true. (Cf. *People v. Staten* (2000) 24 Cal.4th 434, 455-456.) Instead, this evidence was properly admissible for the relevant nonhearsay purpose of showing defendant *had heard* information about Ware's murder and its gang implications "on the street," that defendant *believed* what he had heard, and that he thus had reason, in his own mind, to kill Martin "for Scotty."

Nor was the evidence inadmissible simply because the prosecution failed to establish, by direct means, that defendant had heard the rumors about Ware's death or the gang-related circumstances surrounding it. Ample evidence confirmed defendant's gang membership, his gang identity, and his association with other gang members in Banning. Under these circumstances, and especially considering defendant's specific reference to "Scotty" as he shot Martin, the jury could readily infer defendant's familiarity with the information about Ware that was circulating "on the street."

Moreover, the gang evidence was a relatively minor component of the prosecution's case, and was not unduly inflammatory. It did not emphasize the general violent nature of gang activity or suggest that defendant's gang membership predisposed him to violent crimes, but instead focused narrowly on

52

the prosecution's theory for why defendant might have had a specific reason to kill Martin. Under these circumstances, we are persuaded no error occurred in the admission about evidence of a gang-related motive for Martin's murder.[28]

### B. Investigator Buchanan's Memorandum to the Prosecutor

Defendant contends the trial court violated state law, as well as his rights under the Sixth, Eighth, and Fourteenth Amendments, by denying his request to introduce evidence of a memorandum written by District Attorney Investigator Buchanan to the prosecutor in support of his defense of evidence fabrication. Specifically, he argues the evidence is relevant to (1) Buchanan's intent to threaten to charge Kimiya Gamble as an accessory and his conduct in conformity, (2) Gamble's motive to testify falsely against defendant, and (3) Buchanan's intent to interview Harold Black and Johnnetta Hawkins for the purpose of pressuring them to change their stories about their knowledge of defendant's involvement in the murders. As we explain below, the trial court may have erred, in part, but no reversible prejudice resulted.

#### 1. *Factual and procedural background*

As stated, one week after the murder of Martin, a deputy sheriff stopped Gamble for driving too slowly. A loaded gun was found in Gamble's purse. Defendant was a passenger in the car. Gamble initially told police that she owned the gun.

In May 1996, after ballistics testing revealed the gun was the Martin murder weapon, District Attorney Investigator Buchanan sent a memorandum to the prosecutor about the progress of the investigation (the Buchanan

---

[28] Given our conclusion that the gang testimony of Scott and Black was properly admitted for a nonhearsay purpose, defendant's claim that his constitutional right to confrontation was violated also fails. (*Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9.)

memorandum).  The first paragraph of the memorandum acknowledged that defendant "did not possess" the murder weapon when he was arrested, but expressed Buchanan's belief that defendant "probably stuck it in [Gamble's] purse" at the time the couple was stopped.  The second paragraph, noting that Gamble had already pled guilty to a concealed-weapons charge in the matter, indicated Buchanan's intent to "find" Gamble and "make a [witness] out of her," or to "arrest her" as an accessory to Martin's murder.  The third paragraph stated Buchanan's intent to interview Harold Black (then in Folsom Prison) and to find and interview Johnnetta Hawkins (then believed to be in Las Vegas).[29]

On May 30, 1996, Buchanan interviewed Gamble, who stated that the gun belonged to defendant and that he told her to put it in her purse as police approached the car.  At trial, Gamble testified consistently with this statement.  She also testified that, during her interview with Buchanan, he explained to her that if she had anything to do with the crime, she could be charged as an accessory.  Gamble denied that Buchanan threatened or pressured her in any way to state that defendant owned the gun and testified that she "freely gave" him her statement.

Out of the presence of the jury, trial counsel moved to introduce the Buchanan memorandum into evidence as relevant to prove that, before trial, Buchanan interviewed Gamble with the intent to threaten to charge her as an

---

[29]     The memorandum stated as follows:  "John – [¶]  As you can tell by this [police] report Defendant did not possess the handgun at the time of his arrest.  However, I think he probably stuck it in the female's purse at the time of the car stop.  [¶]  I will find this gal (Kimiya Gamble) and make a wit [*sic*] out of her. Or arrest her for 32 P.C.  She apparently pled out to the 12025/12031 PC charge and took 36 months probation.  [¶]  As of now, Steve Gomez and I plan to go to Folsom and interview Harold Black & Las Vegas to locate and interview Johnetta Hawkins on May 1 & 2.  [¶]  Buck  [¶]  I'm keeping an envelope for def. discovery."

accessory in the Martin murder unless she recanted her statement to police that she owned the gun and instead stated it belonged to defendant. The prosecutor objected that the memorandum contained irrelevant material, but he agreed that the second paragraph was relevant to impeach Buchanan regarding any threats he may have made to Gamble. The trial court ruled that only the statements contained in the second paragraph of the memorandum were relevant and that the defense could impeach Buchanan with them if Buchanan denied on the stand that he threatened Gamble or discussed the possibility she could be charged as an accessory if she was involved in the murder. Counsel then stated that, in light of the court's ruling, and for tactical reasons, the defense would not call Buchanan as a witness and attempt to impeach him on this point.

On appeal, defendant contends the trial court erroneously confined use of the Buchanan memorandum to impeachment of any testimony Buchanan might give on the witness stand. Defendant asserts that the statements in the first two paragraphs were independently admissible under the state-of-mind exception to the hearsay rule as substantive proof that Buchanan intended to, and did, pressure Gamble to recant her statement to police and testify the gun belonged to defendant. (Evid. Code, § 1250, subd. (a)(2).) Defendant also contends the memorandum was admissible for the nonhearsay purpose of showing Gamble relented under Buchanan's pressure and stated falsely that defendant owned the gun. Finally, defendant contends the memorandum was admissible to show Buchanan intended to interview Harold Black and Johnetta Hawkins with the similar intent to pressure those witnesses to change their stories about their knowledge of defendant's involvement in the Coder and Martin murders. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Riggs* (2008) 44 Cal.4th 248, 290 (*Riggs*).)

## 2. *Forfeiture*

The People urge at the outset that defendant forfeited any claim the contents of the Buchanan memorandum were relevant, not simply to impeach Buchanan's denials of improper pressure, but as substantive proof of such pressure, because defendant did not present this theory to the trial court. Defense counsel was hardly articulate on the point, and the issue of forfeiture is thus close, but we conclude the claim was not forfeited.

Counsel did advise the court that the defense intended to call Buchanan, question him about his interview of Gamble, and confront him with the memorandum. Counsel's argument for use of the memorandum centered primarily around this theory. However, counsel also advised that "this is [not] merely and should [not] be merely relegated to the theory of impeachment. [¶] We believe this goes to Mr. Buchanan's intent . . . . And it indicates he has documented his intent *and it is at least circumstantial evidence of what attempts, perhaps, were made . . . .* We believe it is relevant on more than just the theory and issue of impeachment." The obvious relevance of circumstantial evidence that Buchanan improperly pressured Gamble was to refute Gamble's claims that she was not pressured, and to raise the inference that the pressure applied influenced her admission, at odds with her prior statements, that defendant told her to hide the gun. Accordingly, we conclude, the issue was adequately preserved.

On the other hand, we agree defendant has forfeited his appellate challenge to the trial court's refusal to admit the third paragraph of the Buchanan memorandum, which expressed Buchanan's intent to find and interview Harold Black and Johnnetta Hawkins. The trial court ruled that this paragraph was "totally irrelevant." But defense counsel made no attempt whatever to challenge or rebut the court's conclusion. Indeed, counsel's argument for use of the Buchanan memorandum focused exclusively on the Kimiya Gamble interview, and did not mention Black or Hawkins at all. Under such circumstances,

56

defendant did not preserve for appeal his current claim that paragraph three was relevant and admissible because it indicated an intent to pressure Black and Hawkins, like Gamble, to change their stories.

Notwithstanding our conclusion that defendant has forfeited certain of the arguments he now raises, we proceed to the merits of these claims.

### 3. Merits

#### a. Buchanan's asserted intent to pressure Gamble during her police interview

In essence, defendant argues, with respect to Buchanan's interview of Gamble, that the first two paragraphs of Buchanan's memorandum were relevant, and were admissible under the state-of-mind exception to the hearsay rule (Evid. Code, § 1250),[30] not only to impeach any disclaimers Buchanan might assert on the witness stand, but also to prove circumstantially that Buchanan acted in conformity with his expressed intent by pressuring Gamble to say that the Martin murder gun was defendant's, and that defendant told her to put it in her purse when the police stopped her car. In turn, defendant asserts, evidence that Buchanan exerted such pressure on Gamble was relevant to impeach her trial testimony by suggesting, contrary to her denials, that she experienced such pressure, succumbed to it, and thus falsely incriminated defendant. Contrary to the trial court's ruling, defendant insists, he was not limited to using the contents

---

[30] Evidence Code section 1250 provides in pertinent part: "(a) Subject to Section 1252 [statement made under circumstances indicating untrustworthiness], evidence of a statement of the declarant's then existing state of mind . . . (including a statement of intent, plan, motive, design . . . ) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind . . . at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

57

of Buchanan's memorandum to impeach testimonial denials by Buchanan that he improperly pressured Gamble.

Defendant's claim that the first two paragraphs of the Buchanan memorandum were thus admissible as substantive proof he acted on the intent therein expressed has probable merit. (See *People v. Griffin* (2004) 33 Cal.4th 536, 575-579 [under state-of-mind exception to hearsay rule, 12-year-old murder victim's statement to friend that she intended to confront the defendant if he molested her again was admissible to prove she did confront him prior to the murder]; see also, e.g., *People v. Majors* (1998) 18 Cal.4th 385, 404-405 [murder victim's statement of intent to conduct drug deal with people from Arizona on the night he was killed was admissible, under state-of-mind exception to hearsay rule, to prove he carried out such intent].) As defendant suggests, the first two paragraphs of the memorandum, read together, permit the reasonable inference that Buchanan followed through on his stated intent to threaten her with prosecution as an accessory in order to get her to admit that defendant hid, or told her to hide, the murder weapon in her purse.

We need not finally resolve the issue, however, for any error in failing to admit this evidence was harmless by any applicable standard. As we have indicated elsewhere, the admissible evidence that defendant was Martin's killer was extremely strong. Lloyd Marcus, an eyewitness to the fatal shooting of Martin, identified the killer by defendant's nickname of "Popeye." Defendant admitted to Harold Black that he crept up on Martin and shot Martin in the head. The ballistics evidence was consistent with Marcus's eyewitness account of two bullets fired at close range. One week after the killing, the murder weapon was found in a car driven by defendant's girlfriend, and in which he was a passenger. Given the other evidence, the fact that the gun was in his girlfriend's purse, rather than on his person, and that she initially sought to protect him by claiming

58

ownership, was not likely to persuade a rational jury that defendant was not associated with the weapon.

Moreover, aside from any support the Buchanan memorandum might have provided, the defense was able to cross-examination Gamble effectively about the truthfulness of her claim that the murder weapon belonged to defendant. In particular, the defense elicited that at the time she and defendant were arrested, Gamble claimed the gun was hers, and that she subsequently pled guilty to possession of the weapon. Counsel questioned Gamble closely on why she was willing to enter such a plea if the gun was not hers. She answered that the judge told her she would need a lawyer to contest the charge, but was then confronted with her signed plea waiver form indicating that she was entitled to a free appointed attorney if she could not afford to retain one. She finally admitted she was seeking to purchase a firearm at the very time the murder weapon was found in her purse.

Under these circumstances, it appears clear that introduction of the Buchanan memorandum would not have altered the jury's perception of Gamble's credibility, or otherwise undermined its acceptance of the powerful evidence that defendant was Martin's killer. No basis for reversal appears.

*b. Black's and Hawkins's interviews with Buchanan*

Defendant also contends the trial court erred in ruling that the third paragraph of Buchanan's memorandum, in which he expressed his intention to interview Harold Black and Johnnetta Hawkins, was irrelevant. As in the preceding argument, he contends the paragraph was relevant to establish his defense of evidence fabrication. Assertedly, jurors could infer from the evidence that Buchanan intended to pressure both witnesses to change their stories about their knowledge of defendant's involvement in the crimes, and accordingly, that their testimony was unreliable. But Buchanan's memorandum did not suggest any

59

intent to pressure Black or Hawkins to make any particular statements. It simply recited that Buchanan intended to locate and interview these witnesses. Hence, the trial court ruled correctly that this paragraph of the memorandum was irrelevant and thus, inadmissible.

## C. Evidence of Orlando Hunt's Polygraph Test Results

Defendant contends the trial court erred by admitting polygraph evidence in violation of state law and his rights to a fair trial and a reliable verdict under the Sixth, Eight, and Fourteenth Amendments. We agree, as we must, that error occurred, but find no reversible prejudice.

### 1. Factual and procedural background

On direct examination by the prosecutor, Orlando Hunt stated that during his initial police interviews he denied any knowledge of the Coder murder because he was afraid for his safety and that of his family. Hunt further testified that, after a subsequent interview in San Bernardino, he decided to tell investigators the truth about witnessing defendant shoot Coder. On cross-examination, counsel asked Hunt whether he changed his story and implicated defendant because the prosecutor pressed him and threatened to charge him with the murder. Hunt answered that he decided to tell the truth because his conscience bothered him.

Thereafter, out of the presence of the jury, the prosecutor sought to introduce evidence that Hunt took and failed a polygraph test in order to establish his state of mind when he decided to tell police the truth about witnessing the murder. Defense counsel objected that the test results were inadmissible under Evidence Code section 351.1, and that their admission would improperly place a "stamp of approval" upon the version of events to which Hunt ultimately testified. The trial court overruled the objection, reasoning the proffered evidence was relevant to Hunt's credibility because he might have changed his story about his

60

knowledge of the crime based on information he received that he had failed, or that led him to believe he had failed, the polygraph test.

Subsequently, on redirect examination, the prosecutor elicited from Hunt that he initially told police both truth and lies about his knowledge of the murder. He stated he later took a polygraph test, after which the polygraph examiner informed him the results showed he had "told the truth about some — on certain things, and then lied on certain things." The examiner then told Hunt to "just go ahead and tell the truth." Hunt said that, after he thought about what the examiner told him, he decided to tell the truth for "the first time" about being an eyewitness to the murder, and did so during his December 19, 1995, interview with the prosecutor and Buchanan.

### 2. Discussion

#### a. Error analysis

Defendant contends the trial court should have excluded evidence that Hunt was given a polygraph examination about his knowledge of, and involvement in, the Coder murder, and that the examiner informed him he had answered certain unspecified questions falsely. We agree this evidence should have been excluded.

Evidence Code section 351.1 prohibits the admission of polygraph evidence in criminal cases absent a stipulation.[31] (*People v. Wilkinson* (2004) 33 Cal.4th

---

[31] Evidence Code section 351.1 provides: "(a) Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results. [¶] (b) Nothing in this section is intended to exclude from evidence statements made during a polygraph examination which are otherwise admissible."

821, 842, 845-846; accord, *People v. Samuels* (2005) 36 Cal.4th 96, 128 (*Samuels*).)  This section "codifies a rule that this court adopted more than 30 years ago . . . in which we said that polygraph test results 'do not scientifically prove the truth or falsity of the answers given during such tests.' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 817 (*Espinoza*).)  The statutory ban against admission of polygraph evidence " 'is a "rational and proportional means of advancing the legitimate interest in barring unreliable evidence." ' " (*People v. Hinton* (2006) 37 Cal.4th 839, 890 (*Hinton*), quoting *People v. Maury* (2003) 30 Cal.4th 342, 413; see also *U.S. v. Scheffer* (1998) 523 U.S. 303, 314 [a per se rule excluding all polygraph evidence "offends no constitutional principle"].)

The state's exclusion of polygraph evidence is adorned with no exceptions, and its stricture on admission of such evidence has been uniformly enforced by this court and the Court of Appeal.  (See, e.g., *Samuels*, *supra*, 36 Cal.4th at p. 128 [evidence that defendant cooperated with police by offering to take, and passing, polygraph examination was not admissible to refute prosecution's evidence that she was uncooperative during investigation]; *People v. Burgener* (2003) 29 Cal.4th 833, 870-872 (*Burgener*) [on retrial of penalty phase, evidence that a third party's polygraph test results were inconclusive was not admissible for impeachment]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1122 [no exception for favorable mitigating polygraph evidence at the penalty phase]; *People v. Price* (1991) 1 Cal.4th 324, 419 [evidence that prosecution witness twice failed polygraph examination offered for impeachment was inadmissible]; *People v. Morris* (1991) 53 Cal.3d 152, 193-194 [evidence that a prosecution witness had failed a polygraph examination was not admissible to support the defense theory that she was actual killer]; *People v. Kegler* (1987) 197 Cal.App.3d 72, 84-90 [same].)

The People contend the evidence was properly admitted, not to endorse or attack the credibility of answers given during a polygraph examination, but to explain why Hunt, in his postpolygraph statement to police, changed his story about his involvement in the murder and implicated defendant as the killer. The People assert that because such evidence was relevant to Hunt's credibility, this court should recognize a state-of-mind exception to Evidence Code section 351.1 for this limited purpose. We find this argument unpersuasive. (See *People v. Lee* (2002) 95 Cal.App.4th 772, 790-791 (*Lee*) [declining to recognize exception to ban on polygraph evidence offered to explain prosecution witness's state of mind in changing postpolygraph statement to police and as relevant to impeachment of witness's recantation of the statement at trial]; see also *People v. Thornton* (1974) 11 Cal.3d 738, 763-764 [evidence of a defendant's willingness to take a polygraph test is inadmissible as a "badge of innocence" to bolster his credibility]; accord, *Espinoza*, *supra*, 3 Cal.4th at pp. 817-818; *People v. Basuta* (2001) 94 Cal.App.4th 370, 389 (*Basuta*) [evidence that a prosecution witness agreed to take a polygraph examination after giving the police a statement was inadmissible to bolster her credibility].) Accordingly, the trial court's admission of the polygraph evidence was erroneous.

### b. Prejudice analysis

Though admission of the polygraph references was error, we are persuaded, under the circumstances of this case, that no reversible prejudice arose. The instant matter is materially distinguishable from the two cases on which defendant primarily relies, *Lee* and *Basuta*.

In *Lee*, *supra*, 95 Cal.App.4th 772, before the sole witness to the murder provided his initial statement to police, he was administered a police polygraph examination in which he denied having knowledge of the murder. (*Id*. at pp. 776, 782.) The examiner informed the witness that he had failed the test and that there

was a probability he was the shooter.  Thereafter, during a tape-recorded interview, the witness provided the examiner a statement in which he identified the defendant as the shooter.  (*Id*. at pp. 783-785.)  At trial, he denied he had witnessed the murder.  (*Id*. at p. 776.)  The prosecutor was permitted to play the witness's tape-recorded polygraph examination and his interview under the theory this evidence was relevant impeachment material bearing on the witness's state of mind to explain why he subsequently changed his story and identified the defendant as the killer.  (*Id*. at pp. 790-791.)

On appeal, the reviewing court rejected the prosecutor's theory of admissibility and concluded admission of the polygraph evidence was prejudicial error under Evidence Code section 351.1.  (*Lee*, *supra*, 95 Cal.App.4th at pp. 790-791.)  The *Lee* court affirmed there is no state-of-mind exception to the statute's proscription against use of such evidence in criminal proceedings.  (*Id*. at p. 791.)  The error was deemed prejudicial because "[t]he polygraph evidence lent an unreasonable impression of credibility" to the witness's identification of the defendant as the killer in an otherwise weak case.  (*Id*. at p. 792.)  As the Court of Appeal noted, jurors heard no evidence of the lack of certainty of polygraph results.  On the other hand, the prosecutor informed them that "his [polygraph] machine [w]as a piece of space age technology, as reliable as a calculator, 'state-of-the-art,' 'high tech stuff,' and 'copyrighted by [the] Johns Hopkins University applied physics laboratory . . . the same people that monitor the spacecraft.' " (*Id*. at p. 792.)

Similarly, in *Basuta*, *supra*, 94 Cal.App.4th 370, the defendant, a home day care operator, was convicted of assault charges stemming from the death of a 13-month-old toddler by shake-induced injuries.  Other than the defendant, the sole percipient witness to the events leading to the death of the toddler was the defendant's housekeeper.  She initially told police investigators that the toddler

64

fell and hit his head when another child pushed him. (*Id*. at pp. 376-379.) Thereafter, during a police interview, the witness accused the defendant of shaking the toddler. At the conclusion of the interview, the witness offered to take a polygraph examination.[32] (*Basuta*, at pp. 388-389.) At trial, the prosecutor elicited testimony about the victim's offer from a detective who participated in the interview. (*Id*. at p. 389.)

The Court of Appeal concluded admission of the witness's offer to take a polygraph test was prejudicial and warranted reversal of the defendant's conviction. It reasoned the jury's decision on the witness's credibility was central to the prosecution's case, and the detective's testimony "had a high potential to affect the jury's resolution of that issue." (*Basuta*, *supra*, 94 Cal.App.4th at p. 390.) The jury could have found the sole percipient witness credible based on a belief that her willingness to take the polygraph examination reflected her confidence in its results, or could have inferred that the prosecution decided to bring the charges once persuaded that the witness was credible by her offer to take a polygraph test. (*Ibid*.)

Here, by contrast, we agree with the People that erroneous admission of evidence of Hunt's polygraph examination was harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Unlike in *Lee*, defendant suffered no prejudice from any "unreasonable impression of credibility" the polygraph test results themselves might have bestowed on Hunt's identification of defendant as the killer. (*Lee*, *supra*, 95 Cal.App.4th at p. 792.) Kerry Scott unequivocally identified defendant

---

[32] The prosecutor informed the trial court that the witness took and passed a polygraph examination, but defendant noted the results were inconclusive and tended to show deception. (*Basuta*, *supra*, 94 Cal.App.4th at p. 379.)

as Coder's killer and corroborated Gina Lee's presence in or near the field in back of the motel.  Also, Lee testified consistently with Scott that defendant was in the field when Coder was shot and that he left the area immediately thereafter.  Lee also corroborated Hunt's testimony that Hunt was with defendant at the motel shortly before the murder occurred, and that he and defendant ran from the murder scene immediately after the shooting.  Further, Scott's testimony substantially agreed with the pathologist's findings that Coder was shot in the head at close range and fell to the ground after taking a step or two, at most, after being shot.

In addition, unlike in *Basuta*, jurors would not have concluded that Hunt agreed to take the polygraph because he had confidence in the test result; he admitted he initially told police a mixture of truth and lies about his involvement in the murder.  (See *Basuta*, *supra*, 94 Cal.App.4th at p. 390.)  Nor would they have concluded Hunt's testimony was believable merely because he took the test; among other things, Hunt testified against defendant despite threats by defendant and defendant's sister Robin to harm him if he did so.  (*Ibid.*)

Moreover, unlike the housekeeper in *Basuta*, Hunt was not the sole percipient witness to the crime at issue; hence, the jurors in this case would not have credited Hunt's testimony based on their belief the prosecutor would not have prosecuted defendant if he had doubts about Hunt's credibility.  (*Ibid.*)  Indeed, the jury was aware that the prosecutor did have reservations about the credibility of this witness.  During Hunt's post-polygraph interview (the audio tape recording of which was played for the jury), the prosecutor threatened to prosecute Hunt for Coder's murder, and told him, albeit falsely and presumably merely to add force to this threat, that four witnesses said he was standing next to defendant when the victim was shot.  Also, jurors were informed that Hunt was a drug user with a felony record, a factor that weighed against finding Hunt credible merely because he willingly underwent a polygraph test.  Reversal is not required.

### D. Witness Intimidation Evidence

Defendant contends the trial court violated state law and his Sixth, Eighth, and Fourteenth Amendment rights to a fair trial and reliable verdict when it admitted evidence of (1) a threat by defendant's sister Robin to harm Orlando Hunt if he testified against defendant and (2) defendant's threat to kill Gina Lee if she spoke about the Coder murder. The claim is without merit.

#### 1. Assertedly erroneous admission of Robin McKinnon's threats to harm Hunt

##### a. Factual and procedural background

On direct examination by the prosecutor, Orlando Hunt testified that, on the day after the Coder murder, defendant appeared at his bedroom doorway and told him that "if you say anything this could happen to you." Hunt further testified that in January 1995, during his first interview with police, he lied about what he knew about the murder because he feared defendant would harm him and his family if he cooperated with the police. Hunt also told the jury that during his second police interview in December 1995, while he was in custody in an unrelated case, he decided to tell the truth about his knowledge of the murder. Hunt said he changed his mind (after discussing the results of his polygraph test with the examiner, see discussion, *ante*) because his conscience was bothering him. He felt the murder was wrong, he explained, because it "happened for no apparent reason."

On cross-examination, Hunt said he talked to police about the murder for the additional reason that he felt he would be protected from defendant if he did so.[33] He further stated that about two or three weeks after his December 25, 1995,

---

[33] During his initial police interview Hunt and the prosecutor discussed Hunt's fear that defendant would harm him or his family if he cooperated with police in this case. The prosecutor discussed the steps he would take to provide

*(Footnote continued on next page.)*

release from custody, he had a "problem" at a party he attended. He did not elaborate on this event.

On redirect examination, Hunt repeated that he went to a party after his release from custody, and trial counsel objected on the ground he had received no discovery of this evidence.

Out of the presence of the jury, the prosecutor acknowledged he "probably" had not provided counsel discovery of the evidence. Nonetheless, the prosecutor noted, Hunt's reference to an incident at a party had been elicited by defense counsel on cross-examination. The prosecutor made an offer of proof that during one of his conversations with Hunt, Hunt mentioned that Robin had confronted him at a party in Banning. Robin told Hunt he would be hurt if he testified against defendant. Hunt said he was then hit on the head with a bottle, knocked to the ground and kicked, and felt threatened.

Defense counsel argued that evidence of the incident relating to the party should be excluded because (1) the prosecutor failed to provide notice to trial counsel, (2) the evidence was not relevant, given the lack of proof defendant authorized the threat, and (3) even if the evidence was relevant, it was cumulative and unduly prejudicial within the meaning of Evidence Code section 352. The prosecutor replied that evidence Hunt was threatened by a member of defendant's family was relevant to his credibility.

The court ruled the evidence was admissible as to Hunt's credibility. Defense counsel thereafter asked the court to give the jury a limiting instruction and, when it agreed, asked the court to draft an instruction "off the cuff."

---

*(Footnote continued from previous page.)*

protection for Hunt and his family as well as the possibility that Hunt would be placed in the witness relocation program.

When redirect examination resumed, Hunt testified that sometime during 1996 or 1997 he went to a party in Banning, and Robin confronted him, cursing and asking, "What's going on with my brother?  Are you going to tell on my brother?"  Hunt told her he did not want to talk about it.  As he turned his head, she hit him with a bottle, and an unidentified male kicked him in the face.  When asked if "they" made any other statements to him, Hunt answered, "If I go to court, something will happen to me, if I testify."  Hunt testified he later was treated at Banning Pass Hospital for bumps on his head and a "gash."  The trial court thereafter instructed the jury:  "[T]his evidence was introduced as it bears upon the witness's state of mind and his demeanor and manner while testifying.  There is no evidence that the defendant assisted or played any role in the alleged assault."

### b.  Discussion

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.  [Citations.]  An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court.  [Citations.]" (*Burgener, supra*, 29 Cal.4th at p. 869; accord, *People v. Guerra* (2006) 37 Cal.4th 1067, 1141-1142 (*Guerra*); see also *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 [the jury is "entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness's fear"]; see also generally Evid. Code, § 780.)  "[T]here is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is 'directly linked' to the defendant." (*Guerra*, *supra*, at p. 1142, citing *People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1588.)  Here, defendant contends the trial court should have

excluded the evidence of Robin's threat against Hunt on several grounds, each of which we consider in turn.

### (1)  Asserted discovery delay

Defendant initially argues that evidence of Robin's threat should have been excluded because the prosecutor delayed discovery of this evidence.  (See generally § 1054 et seq. [criminal discovery chapter].)  However, although the prosecutor conceded he had failed to provide discovery of this evidence to counsel, "[i]t is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm."  (*People v. Pinholster* (1992) 1 Cal.4th 865, 941.)  Defendant sought no continuance, and he made no showing that his defense would have been different had he been provided timely discovery of evidence of Robin's threat.  Therefore, the trial court did not abuse its discretion by failing to exclude this evidence on this basis.

### (2)  Assertedly cumulative evidence

Next, defendant argues evidence of Robin's threat should have been excluded under Evidence Code section 352 as cumulative of other evidence that Hunt was concerned about the consequences he might suffer for implicating defendant as Coder's killer.[34]  Hunt testified that on the day after the Coder murder, defendant threatened to kill him if he talked about the crime.  In addition, the audio recording of Hunt's initial police interview, which was played to the jury

---

[34]    Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

70

as part of the prosecution's case, also revealed that Hunt feared defendant would retaliate against him and his family if he testified at defendant's trial.

"Evidence that is identical in subject matter to other evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value." (*People v. Mattson* (1990) 50 Cal.3d 826, 871, citing *People v. Carter* (1957) 48 Cal.2d 737, 748-749.) Here, as defendant concedes, evidence that Robin threatened and assaulted Hunt was similar in kind to that of defendant's threat and was additionally probative of Hunt's credibility because it established that Hunt testified notwithstanding multiple threats to harm him if he did so. In addition, evidence Robin violently attacked Hunt in making the threat also proved her sincerity and ability to harm Hunt. The evidence of Robin's threat, accompanied by a violent assault, was more powerful in that defendant used only his voice to threaten Hunt.

Moreover, defendant was placed in custody after he made the threat and, absent evidence to the contrary, no longer reasonably posed a threat of physical harm to Hunt. Under these circumstances, evidence that Robin threatened *and* violently attacked Hunt in an effort to dissuade him from testifying demonstrated a more serious threat to Hunt, and thus was more probative of his credibility than evidence that defendant merely verbally threatened him in an effort to achieve the same result. (Cf. *Hinton*, *supra*, 37 Cal.4th at p. 888 [proof of a series of crimes relevant to character for truthfulness is more probative of credibility than a single lapse].) The evidence was not excludable on this ground. [35]

---

[35] Defendant additionally asserts that, in addition to being cumulative, Hunt's testimony of Robin's threat and attack was unreliable because the prosecutor offered no evidence to corroborate it. He failed to object at trial on this ground and therefore has forfeited this issue on appeal. Nonetheless, the reliability of Hunt's testimony was a question for the jury and went to the weight of the evidence, not its admissibility. (See *People v. Anderson* (2001) 25 Cal.4th 543,

*(Footnote continued on next page.)*

71

### (3) Undue prejudice; inadequate admonition

Defendant finally argues that evidence of Robin's threat should have been excluded as unduly prejudicial under Evidence Code section 352 because it posed a substantial danger the jury would speculate that defendant authorized the attack and threat. To the contrary, as stated above, the trial court admonished the jurors that the evidence was admitted as bearing on Hunt's credibility, and that there was no evidence of defendant's involvement in the threat and attack on Hunt. Defendant nonetheless contends the admonition was inadequate because it did not instruct the jurors that they could not infer defendant was involved in the threat and attack, that they could not consider the evidence in any way against defendant, and that they could consider the evidence to determine only whether Hunt feared testifying because he was threatened. His contentions lack merit.

We "credit jurors with intelligence and common sense" (*People v. Coddington* (2000) 23 Cal.4th 529, 594) and presume they generally understand and follow instructions (*Holt*, *supra*, 15 Cal.4th at p. 662). We think it highly unlikely the jurors understood they could infer defendant authorized or orchestrated the threat and attack, because there was no evidence from which the jurors reasonably could draw this inference, and they were instructed evidence of his involvement did not exist. Further, because the trial court instructed them the evidence was admitted as bearing on Hunt's state of mind and demeanor in testifying, the jurors also understood from the instruction that, logically, the evidence was not relevant to Hunt's credibility unless they found the preliminary fact that he was afraid to testify because he was threatened and attacked.

---

*(Footnote continued from previous page.)*

587 [reliability of witness's testimony is a jury question that affects the weight of the evidence and not its admissibility.].)

In any event, a defendant who believes an instruction requires clarification or modification must request it. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140 (*Rodrigues*).) Defendant neither objected to, nor sought clarification of, the "off the cuff" limiting instruction his counsel requested. Finally, we note that the prosecutor did not argue the jury should consider the evidence of Robin's threat and assault for any improper purpose. Under all these circumstances, defendant manifestly fails to show a reasonable likelihood the jury misinterpreted and misapplied the limiting instruction.

Accordingly, the trial court did not abuse its discretion in refusing to exclude evidence that Robin threatened and attacked Hunt in an effort to intimidate him from testifying.

### 2. *Gina Lee's out-of-court statement*

As noted, Gina Lee testified that at the time of Coder's murder she was outside her motel room; she heard a gunshot and saw defendant and Hunt run from the motel grounds. Johnnetta Hawkins testified on direct examination by the prosecutor that she could not recall Lee's demeanor when Lee thereafter returned to the room. The prosecutor was permitted to impeach Hawkins's testimony on this point with her prior out-of-court statement to Detective Buchanan that "Lee said defendant had said he would kill her if she said anything about the Coder murder."

Defendant does not dispute that Hawkins's prior statement was admissible, under the prior inconsistent statement exception to the hearsay rule (Evid. Code, § 1235), as proof of what Hawkins observed about Lee's demeanor and emotional state. Defendant contends, however, that in admitting Hawkins's prior statement for this purpose, the court erroneously admitted for its truth the portion of this statement that comprised Lee's prior statement to Hawkins, i.e., that "defendant had said he would kill [Lee] if [Lee] said anything about the Coder murder."

73

Defendant urges that because Lee's statement to Hawkins was not inconsistent with Lee's own testimony, it could not be admitted, under the prior inconsistent statement exception to the hearsay rule, to prove that *what Lee said* was true. Even if defendant is correct, however, we conclude any error in admitting evidence that defendant threatened Lee was harmless by any applicable standard.

### a. Factual and procedural background

Following Lee's testimony, and outside the presence of the jury, the prosecutor offered to prove Hawkins told Investigator Buchanan that when Lee returned to the motel room after Coder's murder, she seemed scared and said she had been threatened by defendant not to say anything about what she had seen. The prosecutor sought admission of Lee's out-of-court statement to Hawkins on the ground that it fell within the hearsay exception for prior inconsistent statements. Defense counsel objected on the ground the statement did not qualify under the exception. The court ruled that Lee's statement to Hawkins was inadmissible because the prosecutor had not established it was inconsistent with Lee's testimony, in that Lee had not denied, on the stand, that defendant threatened her.

Thereafter, on direct examination by the prosecutor, Hawkins testified that she could not remember Lee's demeanor when Lee returned to the motel room immediately after Coder's murder, because the murder had occurred many years before her testimony. When the prosecutor asked whether her memory would be refreshed if she read the statement she had given Investigator Buchanan, Hawkins claimed, "No, it would not."[36] The prosecutor questioned whether Hawkins told the investigator that Lee was "very scared" when she returned to the motel room.

---

[36] Buchanan interviewed Hawkins a few days before she testified, while she was in custody on another matter.

Hawkins answered, "She probably was. We was all scared. We had a murder scene." Hawkins further testified that she could not "now" remember that Lee appeared to be scared, and then told the prosecutor, "No, you cannot make me say I seen her being scared."

On its own motion, the court called counsel to sidebar and advised the prosecutor that "based upon [*Hawkins's*] testimony in response to your last several questions, . . . you [may] ask whether or not Gina Lee said that the defendant threatened her because that's [contradictory] to [*Hawkins's*] testimony." In essence, the court ruled that Hawkins's prior statement to Buchanan (i.e., that Lee told Hawkins defendant had threatened to kill her) came within the hearsay exception for prior inconsistent statements and was admissible to impeach Hawkins. At this point, defense counsel stated that "for the record, we object to that." The objection was overruled. When the testimony resumed, the prosecutor elicited from Hawkins that she told Buchanan of hearing from Lee that, immediately after the murder, defendant told Lee he would kill her if she said anything about the killing.

### b. Discussion

As stated, defendant correctly does not dispute that, in light of Hawkins's evasive testimony that she could not remember and would not say that Lee appeared to be scared when she returned to her room after the gunshot, Hawkins's prior inconsistent statement to Buchanan was admissible, under the hearsay exception for prior inconsistent statements, both to impeach the credibility of Hawkins's contrary trial testimony and for the truth of the implication, in Hawkins's earlier statement, that Lee seemed frightened. (Evid. Code, § 1235; see *People v. Garcia* (2008) 168 Cal.App.4th 261, 289; cf., *People v. Morgan* (2005) 125 Cal.App.4th 935, 938-939, 943.) Defendant claims, however, that the trial court erred when it admitted, as included within Hawkins's statement to

75

Buchanan, *the substance of Lee's declaration to Hawkins that defendant had threatened Lee*.

As defendant points out, Lee's extrajudicial statement to Hawkins was hearsay insofar as admitted for the truth of Lee's claim that defendant had made such a threat. Defendant is correct in asserting that no exception to the hearsay rule, including the exception for prior inconsistent statements, permitted admission for that purpose of Lee's statement to Hawkins, because *Lee* was never asked on the stand about such a threat, and thus never denied receiving one.

The People urge that the substance of what Lee told Hawkins about defendant's threat, as reported by Hawkins to Buchanan, was admitted only for the proper, limited purpose of confirming that Lee seemed afraid when she returned to the motel room shortly after the Coder murder. However, the record does not make clear that this is so, or that the jury so understood.[37]

In ruling, on its own motion, that the prosecutor could impeach Hawkins with her prior statement to Buchanan, the trial court did not limit the prosecutor to eliciting only the portion of this statement that dealt with Lee's demeanor. Instead, the court allowed the prosecutor to obtain Hawkins's admission she had told Buchanan of Lee's report that defendant warned Lee to keep quiet about the murder. The jury received no instruction limiting its consideration of this evidence to the issue of Lee's emotional state in the aftermath of the shooting. Thus, an out-of-court statement that defendant threatened Lee came into evidence

---

[37] Indeed, evidence narrowly limited to Lee's emotional state immediately after the shooting was cumulative and highly collateral. That someone who had just witnessed a murder was agitated and upset seems unremarkable. Moreover, Lee herself had already admitted on the stand that she was afraid to testify, had lied at the preliminary hearing because she was "scared," and lied to the police eight or nine months after the shooting because she was frightened.

without any overt restraint on the jury's ability to consider that statement for its truth.

Nonetheless, we find no basis to disturb the judgment. Any error in admitting the "threat" evidence was harmless by any applicable standard. Defendant's identity as the person who walked up to Coder and shot him dead was confirmed by the independent testimony of two eyewitnesses — Orlando Hunt, himself the subject of similar threats by both defendant and defendant's sister, and Kerry Scott. Despite the alleged threat against her, Lee gave eyewitness testimony that also substantially incriminated defendant. Defendant admitted to Harold Black that he shot and killed Coder. Thus, insofar as the threat to Lee implicated defendant further by suggesting his consciousness of guilt, the evidence was cumulative and of minor value.

On the other hand, evidence of defendant's threat against Lee did not unduly bolster her credibility. Though it implied she testified in the face of defendant's menace, other, properly admitted evidence established that fact. Lee herself testified that she was afraid of defendant because he was the type of person who "just goes off." Under the circumstances, any error in admitting hearsay evidence that defendant threatened Lee was harmless beyond reasonable doubt.

Defendant also contends that because the prosecution's case against him in each murder case was close, and because evidence of Lee's statement that defendant threatened her suggested he committed the Coder murder, admission of her statement, even if nominally probative on the issue of her credibility, was an abuse of discretion under Evidence Code section 352 because it unfairly bolstered the prosecution's case in the Martin murder. He also contends the evidence suggested he was generally violent and thus permitted an unfair inference that he likely committed both murders. Here again, however, defendant failed to object on this ground to admission of the threat evidence. He thus forfeited the issue for

77

purposes of appeal.  (E.g., *People v. Alexander* (2010) 49 Cal.4th 846, 905.)   In any event, for the reasons stated above, we find no prejudice warranting reversal of the judgment.

### E.  Jury Instructions

*1.  Trial court's failure to provide CALJIC No. 2.01 on its own motion*

Defendant contends the trial court's failure to instruct the jury on its own motion on the legal principles that controlled the jury's consideration of circumstantial evidence violated state law and his rights to due process, a fair trial by jury, and a reliable guilt determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.  Specifically, he claims the trial court should have instructed the jury with CALJIC No. 2.01 (Sufficiency of Circumstantial Evidence—Generally)[38] in light of Kimiya Gamble's testimony that the gun found in her purse during a traffic stop one week after the murder (i.e., the Martin murder weapon) was owned by defendant.

---

[38]    At the time of trial, CALJIC No. 2.01 provided as follows:  "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.  [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt.  In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which such inference necessarily rests must be proved beyond a reasonable doubt.  [¶] Also, if the circumstantial evidence as to any particular count is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt.  [¶] If, on the other hand, one interpretation of such evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

The People argue that this issue is forfeited for purposes of appeal under the invited error doctrine, noting defense counsel argued in closing that the Martin murder was not primarily a circumstantial evidence case. "When a defense attorney makes a 'conscious, deliberate tactical choice' to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error." (*People v. Wader* (1993) 5 Cal.4th 610, 657-658; see *People v. Tate* (2010) 49 Cal.4th 635, 695, fn. 32 (*Tate*); *People v. Valdez* (2004) 32 Cal.4th 73, 115.)

Here, the record on appeal reveals that when the parties conferred with the trial court regarding the proposed jury instructions, trial counsel was silent when the prosecutor indicated that he wanted to withdraw his request for CALJIC No. 2.01. For purposes of the invited error doctrine, however, the absence of a request is not equivalent to an express tactical objection. (E.g., *People v. Wickersham* (1982) 32 Cal.3d 307, 333 (*Wickersham*).)

The People nonetheless assert this court properly may review the entire record and determine that trial counsel's comment in closing argument that the Martin murder case was not primarily a circumstantial evidence case demonstrates he believed CALJIC No. 2.01 was inapplicable and thus failed to request the instruction as a matter of trial tactics. To the contrary, our review of the record on the question before us is limited to that portion concerning the formulation of the instructions provided to the jury.[39] (Cf. *Wickersham*, *supra*, 32 Cal.3d at pp. 333-

---

[39] Even assuming we may properly review the closing argument in this case to determine whether trial counsel deliberately refrained from requesting, or objecting to the omission of, CALJIC No. 2.01 for tactical reasons, we disagree with the People's assertion that, based on counsel's comment in closing argument, we may infer that counsel believed the instruction was inapplicable. Significantly, for this point, trial counsel emphasized the circumstantial nature of the prosecution's evidence of defendant's possession of the Martin murder weapon

*(Footnote continued on next page.)*

334 [declining to "infer from the record as a whole that defense counsel made a deliberate tactical decision not to request instructions" complained of].) Therefore, because trial counsel expressed no deliberate tactical purpose in failing to request CALJIC No. 2.01, the invited error doctrine does not apply.

In any event, we find no error. The trial court is required to give CALJIC No. 2.01 on its own motion when the prosecution relies substantially on circumstantial evidence to prove guilt. (*People v. Yeoman* (2003) 31 Cal.4th 93, 142, citing *People v. Wright* (1990) 52 Cal.3d 367, 406 (*Wright*); *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49.) Conversely, the instruction need not be given when circumstantial evidence is merely incidental to and corroborative of direct evidence, due to the "danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime." (*People v. Jerman* (1946) 29 Cal.2d 189, 197; see *Yeoman*, *supra*, at p. 142; *Yrigoyen*, *supra*, at p. 50.)

The primary prosecution evidence in the Martin murder case was Harold Black's testimony that during a conversation with defendant while both were imprisoned in Chino, defendant admitted he shot Martin in the head, and Sergeant Palmer's testimony that eyewitness Lloyd Marcus identified defendant as Martin's killer. The prosecution's circumstantial evidence related essentially to defendant's possession of the murder weapon one week after Martin was killed. Though the incriminating effect of this evidence was indeed substantial, it complemented, and was merely corroborative of, defendant's admissions. The trial court thus was not obligated to instruct on circumstantial evidence. (*Wright*, *supra*, 52 Cal.3d at

---

*(Footnote continued from previous page.)*

one week after the murder and argued there was no "connection" between defendant's possession of that weapon and the possession of that weapon by Martin's killer one week earlier.

p. 406 [instruction on circumstantial evidence is not required for circumstantial evidence merely corroborative of direct evidence of a defendant's extrajudicial admissions].)

Defendant disagrees and contends that the exception recognized in *People v. Wright* does not apply here because the gun evidence was central to the prosecution's case.[40]  He reasons that, given the gun evidence, the jurors would have dismissed any doubts they may have had about Black's and Palmer's credibility, because, if defendant possessed the gun one week after the murder and failed to establish any other plausible explanation for possessing it, the jurors would have concluded he was the killer.  But again, the fact that strong circumstantial evidence bolsters, corroborates, or supports the direct evidence of guilt does not mean CALJIC No. 2.01 must be given sua sponte.

Nor did the prosecution rely primarily on "a pattern of incriminating circumstances" to prove defendant's guilt.  (See *People v. Williams* (1984) 162 Cal.App.3d 869, 875 [CALJIC No. 2.01 must be given where the direct evidence is a small part of the prosecution's case or "the defendant's guilt is to be inferred from a pattern of incriminating circumstances"].)  Defendant's unequivocal

---

[40]     As part of his argument, defendant suggests that we may consider the "quality" of the evidence in assessing whether the prosecution substantially relied on circumstantial evidence to prove his guilt.  Specifically, he contends that where the quality of the direct evidence is weak, and the quality of the circumstantial evidence is strong, the prosecution has substantially relied on the circumstantial evidence.  He provides no persuasive authority for our consideration of such a factor in analyzing whether instruction on circumstantial evidence was required.  Indeed, defendant's suggestion appears to go to the weight of the evidence, a question which is within the exclusive province of the jury.  (Evid. Code, § 312, subd. (b) ["Subject to the control of the court, the jury is to determine the effect and value of the evidence addressed to it, including the credibility of witnesses"]; *People v. Sanders* (1995) 11 Cal.4th 475, 531 [the jury is assigned the exclusive function of resolving questions of fact, credibility of witnesses, and the weight to be accorded evidence].)

admission to murdering Martin was the basis of the prosecution's case. Accordingly, the trial court did not err by failing to instruct the jury with CALJIC No. 2.01.

Finally, defendant suffered no federal constitutional violations because the federal Constitution does not require trial courts to instruct on the evaluation of circumstantial evidence when, as here, the jury is properly instructed on the reasonable doubt standard. (*Holland v. United States* (1954) 348 U.S. 121, 140; see also *Victor v. Nebraska* (1994) 511 U.S. 1, 7-17 [approving California's instruction defining reasonable doubt]; see also *People v. Rogers* (2006) 39 Cal.4th 826, 886.)

### 2. *Asserted unconstitutionality of CALJIC Nos. 2.02, 2.03, 2.21.2, 2.22, 2.27, 2.51, and 8.20*

Defendant claims that the cumulative effect of various standard instructions in this case concerning the reasonable doubt standard — CALJIC Nos. 2.02 (Sufficiency of Circumstantial Evidence), 2.03 (Consciousness of Guilt — Falsehood), 2.21.2 (Witness Willfully False), 2.22 (Weighing Conflicting Testimony), 2.27 (Sufficiency of Testimony of One Witness), 2.51 (Motive), and 8.20 (Deliberate and Premeditated Murder) — violated his right to due process, a trial by jury, and a reliable capital trial. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15-17.)[41] We previously have rejected similar claims, and defendant offers no persuasive reason to reconsider them here.

---

**41** The parties jointly requested that the trial court give CALJIC Nos. 2.02, 2.21.2, 2.22, 2.27, 2.51, and 8.20. The People assert that because defendant requested these instructions, the invited error doctrine bars him from complaining on appeal that the instructions were erroneously given. The record does not reveal, however, that trial counsel expressed a deliberate tactical purpose in jointly requesting these instructions. Thus, the invited error doctrine does not apply. (*People v. Moon* (2005) 37 Cal.4th 1, 28 [the defendant, who jointly requested standard instruction, did not invite error].)

Thus, we summarily reaffirm that CALJIC Nos. 2.02, 2.21.2, 2.22, 2.51, and 8.20 do not unconstitutionally lessen the prosecution's burden of proof (*People v. Friend* (2009) 47 Cal.4th 1, 53 (*Friend*) [CALJIC Nos. 2.02, 2.21.2, 2.22, 2.51, 8.20]; *Guerra*, *supra*, 37 Cal.4th at p. 1139 [CALJIC Nos. 2.02, 2.21.2, 2.22, 2.51]; *Stewart, supra*, 33 Cal.4th at p. 521 [CALJIC No. 2.02]; *People v. Nakahara* (2003) 30 Cal.4th 705, 714-715 [CALJIC Nos. 2.21.2, 2.22, 8.20]); CALJIC No. 2.03 is not impermissibly argumentative and does not permit the jury to draw improper permissive inferences  (*Taylor*, *supra*, 48 Cal.4th 574, 630; *McWhorter*, *supra*, 47 Cal.4th at p. 377); and CALJIC No. 2.27 does not impermissibly lessen the prosecution's burden of proof when read in context of other instructions, including the instruction defining proof beyond a reasonable doubt.  (*People v. Turner* (1990) 50 Cal.3d 668, 697; see also *Friend*, *supra*, at p. 53.)

### 3.  CALJIC No. 2.71

The prosecutor introduced evidence of various admissions made by defendant during his in-custody police interview, as well as the following evidence of unrecorded pretrial statements by defendant that tended to implicate him in the Coder and Martin murders:  (1) Johnnetta Hawkins's police statement and ultimate testimony that, according to Gina Lee, defendant threatened on the night of the Coder murder to kill Lee if "she said anything"; (2) Orlando Hunt's testimony that during the day after the Coder murder, defendant warned Hunt not to say anything or "this could happen to you"; and (3) Harold Black's testimony that while he and defendant were incarcerated together in Chino State Prison in 1994, defendant told Black he killed Coder and Martin.

The parties jointly asked the trial court to provide the jury with CALJIC No. 2.71, which instructs the jury to view a defendant's admissions with caution.[42] At the conference on the proposed instructions, the court addressed the applicability of the cautionary language of the instruction (i.e., the bracketed paragraph) as follows: "How about the bracketed portion of 2.71, the last paragraph? 'Evidence of an oral admission of the defendant not made in court should be viewed with caution.' I believe there's an instruction under [CALJIC No.] 2.71 that applies to a situation where the statement is not tape-recorded." The prosecutor responded, "Right. I think that's supposed to be taken out in a situation like ours." Trial counsel agreed. Thereafter, the trial court omitted the cautionary language when it instructed the jury with CALJIC No. 2.71. Defendant contends the trial court erred, in violation of state law and his rights to a fair and reliable capital trial under the Eighth and Fourteenth Amendments, by failing to instruct the jury on its own motion that the evidence of defendant's unrecorded admissions should be viewed with caution.[43] We find no prejudicial error.

---

[42] At the time of trial, the standard version of CALJIC No. 2.71 read: "An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part.

"[Evidence of an oral admission of [a] [the] defendant not made in court should be viewed with caution.]"

[43] The People contend defendant is barred from presenting this issue on appeal under the doctrine of invited error because trial counsel agreed the cautionary language of CALJIC No. 2.71 should be omitted. The People are mistaken. The trial court and the parties recognized that, as discussed below, the cautionary language applied when evidence of the defendant's *unrecorded* admissions is admitted. Although the prosecutor thereafter impliedly requested the cautionary language be omitted, the subsequent remarks of the court and

*(Footnote continued on next page.)*

It is well established that the trial court must instruct the jury on its own motion that evidence of a defendant's unrecorded, out-of-court oral admissions should be viewed with caution. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1134; *Slaughter*, *supra*, 27 Cal.4th 1187, 1200; *People v. Mayfield* (1997) 14 Cal.4th 668, 776.) The purpose of the cautionary language in CALJIC No. 2.71 is to assist the jury in determining whether the defendant ever made the admissions. (*Slaughter*, at p. 1200; *People v. Ervine* (2009) 47 Cal.4th 745, 781 (*Ervine*); *People v. Livaditis* (1992) 2 Cal.4th 759, 784.) For this reason, the cautionary language is inapplicable to defendant's *recorded* admissions. (*Slaughter*, *supra*, at p. 1200; *Mayfield*, *supra*, at p. 776.)

Defendant's oral threat to Lee that he would kill her if "she said anything" reasonably tended to prove his guilt of Coder's murder and therefore satisfied the definition of an admission under CALJIC No. 2.71. Similarly, defendant's warning to Hunt that if he said anything, "this could happen to you," and his statements to Black that he killed Coder and Martin, each qualified as admissions under this instruction. We thus agree with defendant that the trial court erred in failing to instruct the jury on its own motion to view with caution these unrecorded admissions.

In determining whether the failure to instruct requires reversal, "[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the

---

*(Footnote continued from previous page.)*

counsel during this colloquy are ambiguous as to whether the prosecutor intended this language be omitted as to defendant's recorded or unrecorded admissions. In any event, because defendant did not express a tactical basis for omission of the cautionary language, he invited no error. (*Wickersham*, *supra*, 32 Cal.3d at p. 330.)

instruction been given." (*People v. Carpenter* (1997) 15 Cal.4th 312, 393; see *People v. Dickey* (2005) 35 Cal.4th 884, 905; *People v. Stankewitz* (1990) 51 Cal.3d 72, 94.)  " 'Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately.  [Citations.]' " (*People v. Dickey*, 35 Cal.4th at p. 905, quoting *People v. Pensinger* (1991) 52 Cal.3d 1210, 1268.)  This court has held to be harmless the erroneous omission of the cautionary language when, in the absence of such conflict, a defendant simply denies that he made the statements.  (See *People v. Dickey*, *supra*, 35 Cal.4th at p. 906.)  Further, when the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, we have concluded the jury was adequately warned to view their testimony with caution.  (*Id.* at pp. 906-907.)

Here, there was no conflict in the evidence about the precise words used, their meaning, or whether the admissions were repeated accurately.  Defendant simply denied making the statements.  In addition, the instructions given sufficiently alerted the jury to view the testimony of Hawkins, Hunt, and Black with caution.  Defendant suffered no prejudice by any omission.  (See *People v. Dickey*, *supra*, 35 Cal.4th at pp. 906-907.)

With respect to defendant's statement to Black, in particular, defendant asserts that CALJIC No. 3.20,[44] which the trial court did give at defendant's

---

[44]     As provided in this case, CALJIC No. 3.20 read as follows:  "The testimony of an in-custody informant should be viewed with caution and close scrutiny.  In evaluating this testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness.  This does not mean that you may arbitrarily disregard this testimony, but you should give it the weight to which you find it to

*(Footnote continued on next page.)*

request, did not adequately advise the jury to scrutinize Black's testimony, because it did not admonish the jury about *both* Black's status as an in-custody informant *and* the fact that Black was purporting to relay an admission by defendant. We are not persuaded. Because Black was the only jailhouse informant who testified, the jury reasonably understood that CALJIC No. 3.20 applied to only his testimony. This instruction advised the jury to consider with caution his testimony regarding defendant's admissions. Logically, that caution would extend to any claim by Black that defendant admitted to Black he murdered Martin. Thus, CALJIC No. 3.20 effectively provided the cautionary language that was omitted from CALJIC No. 2.71. The jurors also were instructed under CALJIC No. 2.71 that they were the exclusive judges of whether defendant made these admissions. Under these circumstances, the omitted cautionary language was superfluous and would not have contributed significantly to the jury's consideration of the instructions given.

Accordingly, there is no reasonable probability the jury would have returned a more favorable verdict in the absence of the instructional error.

### 4. CALJIC No. 17.41.1

The trial court instructed the jury with CALJIC No. 17.41.1, which provides: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to

---

*(Footnote continued from previous page.)*

be entitled in the light of all the evidence in this case. [¶] ['In-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by a defendant while both the defendant and the informant are held within a correctional institution.]"

disregard the law or to decide that case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the court of the situation." Defendant contends that by so instructing the jury, the trial court violated his Sixth and Fourteenth Amendment rights to due process and a fair and impartial trial.

In *People v. Engelman* (2002) 28 Cal.4th 436, 439-440 (*Engelman*), this court held "the instruction does not infringe upon [a] defendant's federal or state constitutional right to trial by jury or his state constitutional right to a unanimous verdict," though in the exercise of our supervisory power, we disapproved use of this instruction in *future* trials. (*Id*. at p. 449.)

Defendant fails to persuade us to reconsider our conclusion in *Engelman* that the mere use of CALJIC No. 17.41.1 in a pre-2002 trial such as his was not constitutional error requiring that we disturb the judgment. In addition, he points to nothing in the record of this case that indicates any juror refused to deliberate or expressed an intention to disregard the law or to decide the case on an improper basis. (See *People v. Brown* (2004) 33 Cal.4th 382, 393 (*Brown*), citing *People v. Ortiz* (2003) 109 Cal.App.4th 104, 119, fn. 7.) No basis for reversal appears.

## F. Cumulative Effect of Guilt Phase Errors

Defendant contends the cumulative effect of all alleged errors in parts II.A., III.A.-D., E.1, and E.3 above was prejudicial and violated his rights to a fair trial and reliable jury verdicts under the Eighth and Fourteenth Amendments. As noted, we have identified no single instance of prejudicial error. Defendant fails to convince us that even if no individual error was prejudicial in isolation, the combination of trial errors rendered his trial fundamentally unfair. Hence, his assertion of cumulative prejudice fails.

# IV. PENALTY PHASE ISSUES

## A. Prior Unadjudicated Criminal Activity Involving Force or Violence (§ 190.3, Factor (b))

Defendant argues the trial court erred in admitting evidence, in aggravation of penalty, of the following unadjudicated criminal activity under section 190.3, factor (b): (1) during a November 12, 1988, arrest, defendant possessed bullets and rock cocaine; (2) defendant broke his sister Robin's television and made a subsequent statement to the police that could be construed as an implied threat against her; and (3) on or about December 11, 1984, defendant committed a battery and a robbery in a high school cafeteria. As to the further evidence presented by the prosecution under factor (b) that defendant violated section 4502 by possessing a shank—a prison-made stabbing weapon—while confined in a penal institution, he asserts that the court erred by omitting the "knowledge element" from the instruction on this offense, and by failing to instruct the jury on the sufficiency of circumstantial evidence regarding this incident. Defendant contends the cumulative effect of the alleged errors violated state law as well as his rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments.

As explained below, each contention lacks merit. The trial court properly admitted the evidence and it correctly instructed the jury. In any event, any error was harmless.

### 1. Evidence of defendant's possession of bullets and rock cocaine

Section 190.3, factor (b) (factor (b)), permits aggravating evidence of a defendant's criminal conduct (aside from the capital offense) involving actual or threatened force or violence. Pursuant to factor (b), the prosecution introduced evidence that, on November 12, 1988, around 4:00 p.m., then Banning Police Officer Marshall Palmer and two other Banning police officers were dispatched to Eastside Park based on information provided by an anonymous tip. The

dispatcher relayed that an anonymous informant reported that a group of African-American males were in the park, standing near a blue Mercedes. Two of the men had handguns. One of the subjects was not wearing a shirt and the other was wearing all black, including a black cap. Eastside Park was a known as a "hangout" for drug users and dealers. At the park, Palmer observed a group of 10 to 15 African-American males, including defendant, standing or sitting around a Toyota pickup. For officer safety purposes, the officers detained the members of the group and ordered them to place their hands on the truck. Each individual complied. As Palmer approached the group, Orlando Hunt, who was sitting on a bench 10 to 15 yards away with another male, began to walk away. When one of the other officers twice called to him, Hunt pulled a .357 Magnum handgun from his waistband and threw it on the ground. The other officers performed a patdown search of the others in the group for weapons.

Officer Shubin, who searched defendant, felt objects that he believed were bullets in defendant's upper right jacket pocket. Because the pocket was deep and the jacket was bulky, and because defendant matched the description of one of the suspects provided by the tipster, the officer put his hand deeper into the same pocket in order to do a more thorough search for a gun and to recover the objects he believed were bullets. While recovering the objects, the officer retrieved a plastic Tupperware container. The officer opened the container and found that it held six rocks resembling rock cocaine. Defendant's pockets also contained twelve .357-caliber bullets and $168 in cash. Defendant was placed under arrest for possession for sale of cocaine.

Before the January 1999 commencement of the penalty phase of his capital trial, defendant moved on two grounds to exclude the evidence that bullets and rock cocaine were found on his person in November 1988. First, he sought, under section 1538.5, to suppress this evidence as the product of an unreasonable search

90

and seizure in violation of the Fourth Amendment. Second, he asserted that his possession of the bullets was not admissible under factor (b) as "criminal activity . . . involv[ing] the use or attempted use of force or violence." After holding an evidentiary hearing (see *People v. Phillips* (1985) 41 Cal.3d 29, 72-73, fn. 25), the trial court denied the motion, finding that the search and seizure were constitutional, and that the evidence was admissible under factor (b).

When the evidence was introduced in the penalty trial, defendant again protested that it did not demonstrate violent criminal activity for purposes of factor (b). The trial court disagreed, explaining it had found the evidence admissible as sufficient to show defendant aided and abetted Hunt in a violation of section 12025, carrying a concealed firearm. Thereafter, over defendant's objection, the court instructed the jury on the elements of a section 12025 violation, and of aiding and abetting, and explicitly advised that the November 1988 incident could be considered under factor (b).

On appeal, defendant renews his claims that admission of evidence of the November 1988 incident was improper under the Fourth Amendment and section 190.3, factor (b). As to the second issue, defendant further claims that even if the evidence was admissible on an aiding and abetting theory, the trial court failed to provide, sua sponte, adequate instructions on the limits of circumstantial evidence in this context.

We need not determine the merits of these claims, for we are persuaded that admission of evidence of defendant's November 1988 possession of bullets and rock cocaine was harmless on the issue of penalty by any applicable standard.[45]

---

[45] The People do not contend that defendant was precluded, in his January 1999 penalty trial, from moving, on constitutional grounds, to suppress evidence arising from an unrelated incident that occurred over 10 years earlier. A statutory suppression motion must be timely brought, and, once denied, can only be

*(Footnote continued on next page.)*

Aside from the 1988 "bullets and cocaine" incident, the prosecution's aggravating evidence demonstrated defendant's well-established history of using force and violence. These examples included a violent battery and threats of further violence against his own sister, and a robbery and battery he committed in his school cafeteria. Importantly, the cold-blooded, cruel, and senseless murders of Coder and Martin sealed defendant's fate. He walked up to Coder, placed a gun against his head, and brazenly shot him. He similarly murdered Martin by shooting him in the head, in an act of revenge for the unexplained death of a fellow gang member, remote in time. There is no reasonable possibility that any erroneous admission of evidence that defendant once possessed bullets while engaged in selling cocaine would have affected the jury's penalty decision.

---

*(Footnote continued from previous page.)*

renewed under specified circumstances. (§ 1538.5, subd. (h); see, e.g., *People v. Frazier* (2005) 128 Cal.App.4th 807, 829; *People v. Ramos* (1997) 15 Cal.4th 1133, 1163.) However, section 1538.5 appears to assume that the motion will be brought in the criminal action directly related to the search and seizure of the evidence at issue. Defendant was never charged with any offense arising from the November 1988 incident, and the record does not disclose whether he had any prior opportunity and incentive to contest the validity of the search that led to discovery and seizure of the bullets and rock cocaine on his person. As indicated, the People do not contest the procedural propriety of defendant's suppression motion, and the record does not indicate whether the Fourth Amendment issues defendant now asserts could and should have been raised at an earlier time. Moreover, it is at least arguable that a defendant may move, in a trial on capital charges, to suppress evidence, offered in aggravation of punishment, which was unconstitutionally obtained in an unrelated prior incident for which he or she sustained no conviction. (Cf., e.g., *People v. Horton* (1995) 11 Cal.4th 1068, 1134-1136 [in capital case, defendant may collaterally attack, by motion to strike, prior *conviction* tainted by "fundamental" constitutional defect].) For these reasons, and because, as explained below, we find the admission of this evidence harmless in any event, we will assume, though we expressly do not decide, that the suppression motion was proper.

## 2. Evidence of defendant's battery of his sister, Robin

The prosecution presented evidence that, on August 10, 1992, Banning Police Officer Lowell Wheeler interviewed defendant's sister, Robin McKinnon, regarding a crime she reported. Robin stated that she stood behind defendant in her bedroom and that defendant hit her in her face with his right hand, which was in a cast. She said that he then began to choke her and that they struggled. After Robin broke loose from his grip, she called police. Approximately 20 minutes later, Wheeler returned to Robin's home in response to another call from her. She had reported that defendant was breaking her property. As Wheeler entered the residence through the front door, he observed defendant breaking a small portable television. After defendant was transported to the police station, he spontaneously said, "You can keep me for a week or a month, but when I get out I'm going to take care of it."

Defendant contends the trial court erred in admitting evidence under factor (b) that he damaged his sister's television, and that, later, he said to police that "[y]ou can keep me for a week or a month, but when I get out I'm going to take care of it." He argues that his breaking of his sister's property did not constitute criminal activity involving force or violence within the meaning of this factor. Also, he contends that his statement to police after he battered his sister was not part of a continuous course of criminal activity involving force or violence.

In *People v. Kirkpatrick*, this court held that evidence of the defendant's threats to property was properly admitted as relevant to the prosecution's evidence that defendant made a threatening phone call in violation of Penal Code section 653m. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1014.)

The circumstances here are similar in kind. Defendant committed a violent battery against his sister. (§ 243.) His conduct in returning to his sister's residence and breaking her television provided context to this incident, because it explained why he was arrested 20 minutes *after* the officers had decided not to

93

arrest him for battery—that is, the officers returned to the house only because Robin had reported during the interim that he was "breaking her property."  In addition, the statement defendant made to police after his arrest, although a noncriminal act, was made sufficiently close in time to constitute a continuous course of conduct that was probative of an understanding of the violent potential of his battery against his sister as well as his willingness to resort to violence in the future.  (Cf., *People v. Kipp* (2001) 26 Cal.4th 1110, 1114; *id*. at pp. 1133-1134 [evidence that defendant threatened to kill a sheriff's sergeant who had assisted in subduing him during his unsuccessful escape was admissible under factor (b) because it was relevant to "an understanding of the violent potential of defendant's attempted escape"].)

In any event, any error in admitting this evidence was harmless.  The prosecution presented additional evidence that defendant hit his sister's face with the cast on his right hand and choked her.  The murders of Coder and Martin themselves were especially cruel and senseless.  Under these circumstances, it is not reasonably possible that the jury would have rendered a different verdict had the challenged evidence been excluded.  (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1232.)

>   3. *Evidence of defendant's battery and robbery in the high school cafeteria.*

The prosecution offered the following evidence as proof defendant had committed a robbery and battery.  On December 11, 1984, 17-year-old defendant bought some beef jerky in the cafeteria of a "continuation school" in the Banning Unified School District.  Upon discovering that the jerky was stale, he told the cashier that he wanted his money back.  The cashier refused to refund his money because he had opened the packaging.  Defendant then threatened to take a box containing money that the cashier kept in front of her.  She replied, "If you do, you'll go to jail. . . . go ahead."  Defendant took the box and started to walk out of

94

the cafeteria.  When a teacher stopped him in front of the exit door, defendant shoved the teacher, took the money box, and exited through the door.

Defendant claims the evidence was insufficient to establish the elements of robbery.  He further contends that the incident did not amount to an act involving the degree of force or violence necessary for its admission under factor (b), and was not relevant to the penalty determination under the Eighth and Fourteenth Amendments.  He is wrong on both counts.

### a.  The robbery

Defendant contends the trial court erroneously admitted evidence of the cafeteria incident under factor (b), because it was insufficient to prove the elements of robbery.  Specifically, he argues that the cashier consented to his taking of the money box and that he did not engage in conduct amounting to force or fear.

"Robbery is 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.'  (§ 211; see *People v. Scott* (2009) 45 Cal.4th 743, 749 . . . .)  A defendant who does not use force or fear in the initial taking of the property may nonetheless be guilty of robbery if he uses force or fear to retain it or carry it away in the victim's presence.  (*People v. Gomez* (2008) 43 Cal.4th 249, 256, 264; *People v. Estes* (1983) 147 Cal.App.3d 23, 27.)"  (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1349.)  That is, "[a] robbery is not completed at the moment the robber obtains possession of the stolen property.  The crime of robbery includes the element of asportation, the robber's escape with the loot being considered as important in the commission of the crime as gaining possession of the property. . . . [A] robbery occurs when defendant uses force or fear in resisting attempts to regain the property or in attempting to remove the property from the owner's immediate presence regardless of the means by which

95

defendant originally acquired the property." (*People v. Estes* (1983) 147 Cal.App.3d 23, 27-28.)

"A robbery cannot be committed against a person who is not in possession of the property taken or retained. [Citation.] Possession may be actual or constructive. [Citation.] 'A person who owns property or who exercises direct physical control over it has possession of it, but neither ownership nor physical possession is required to establish the element of possession for purposes of the robbery statute.' [Citation.] ' " [T]he theory of constructive possession has been used to expand the concept of possession to include employees and others as robbery victims." ' [Citation.] [¶] [A]ll employees on duty have constructive possession of their employer's property and may be separate victims of a robbery." (*People v. Bradford*, *supra*, 187 Cal.App.4th at pp. 1349.) In addition, "persons other than employees may be robbery victims if they have a ' "special relationship" with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner.' [Citation.] Formulated another way, the question is whether the prospective victim 'may be expected to resist the taking.' [Citation.]" (*Ibid*.)

Preliminarily, we address defendant's contention that because the cashier told him to "go ahead" and take the money box, she consented to the taking. To the contrary, the record reveals that defendant obtained the money box without her consent. When he complained to the cafeteria cashier about his stale beef jerky and requested a refund, she responded that she could not refund his money because he had opened the food packaging. Clearly unhappy with the manner in which the cashier resolved his complaint and her refusal to refund his money, defendant then decided that he would refund his money himself by taking the money box. Only after he told the cashier of his intent to do so did she relinquish

her possession of the box and surrender it, warning defendant that if he took it, he would go to jail. There was no consent.

Next, evidence that defendant thereafter pushed the teacher stationed at the exit door of the cafeteria before he escaped through the door rendered his taking a robbery. Even if this on-duty teacher—who presumably was positioned at the door to monitor activities in the cafeteria—did not have actual possession and control of the cash box, the teacher had constructive possession of the property. We have confirmed that, regardless of their specific responsibilities, on-duty employees have constructive possession of their employer's property for purposes of a robbery. (*People v. Scott* (2009) 45 Cal.4th 743, 752, 754.) No reason appears to exclude school employees from this sound principle. Thus, defendant's act of shoving the teacher out of his way in his effort to escape the cafeteria with the money box completed a robbery of the teacher. (See *People v. Bradford*, *supra*, 187 Cal.App.4th at pp. 1349-1350; *People v. Estes, supra*, 147 Cal.App.3d at pp. 27-28.)

### b. The battery

In the alternative, defendant contends that, if the evidence of the cafeteria incident was insufficient to prove that he robbed the teacher but sufficient to prove he battered her, the battery did not involve the degree of force or violence required for admission under factor (b). We disagree. "Whether [defendant's] acts were serious enough to be given weight in the penalty determination is a matter for the jury to decide." (*People v. Smith* (2005) 35 Cal.4th 334, 369.) Because the jury was properly instructed to consider this circumstance, there was no error in admitting the evidence.

### 4. Asserted erroneous instruction regarding the shank incident

On February 5, 1997, during a search of defendant's cell at the Robert Presley Detention Center in Riverside County, a correctional officer discovered a

metal shank, approximately nine inches long, in between the ceiling and a light fixture. The shank could be pulled out of the space by pulling on the attached string. The parties stipulated that when the search was conducted, defendant was the only person housed in the cell, that he had lived there for about six months, and that other inmates previously had been housed in the cell. The cells were searched at least once a week, and were inspected more frequently if there was a reason to search. Correctional officers routinely searched the light fixtures when conducting cell searches.

Defendant contends the trial court erred by failing to instruct jurors on the knowledge element of the crime of possession of a weapon by a prisoner, a violation of section 4502. (See, e.g., *People v. Strunk* (1995) 31 Cal.App.4th 265, 272.) He further urges the court was obliged to instruct, under CALJIC No. 2.01, that if the evidence reasonably supported an inference defendant did not knowingly possess the shank, the jury must so find. In both instances, defendant demonstrates no prejudicial error.

Here, the trial court instructed the jury regarding the section 4502 violation as follows: "Every person who while, . . . confined in, while being conveyed to or from any penal institution, or while under the custody of officials, or officers or employees of any penal institution, possesses or carries upon his person or has under his custody and control any instrument or weapon, commonly known as a shank, is guilty of violation of Penal Code Section 4502, a crime. [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person was confined in or being conveyed to or from any penal institution or under the custody of officials, officers or employees of a penal institution. And 2. while so confined, being conveyed or under that custody, possessed or carried upon his person or under his custody or control a weapon known as a 'shank.' "

98

The court also provided the general intent instruction, CALJIC No. 3.30: "In the crimes of Battery, possession of a concealed firearm, and possession of a weapon by a prisoner, there must exist a union or joint operation of act or conduct and general criminal intent. General criminal intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, [he] [she] is acting with general criminal intent, even though [he] [she] may not know that [his] [her] act or conduct is unlawful."

Any error regarding the failure to instruct the jury on the knowledge requirement was thus harmless. Manifestly, if the jury concluded that defendant *intentionally* possessed the shank, it necessarily concluded that he *knowingly* possessed it.

Equally harmless was any error in failing to instruct, under CALJIC No. 2.01, that if the evidence was reasonably susceptible of an inference that defendant lacked knowledge of the shank, the jury must accept that interpretation. In light of the evidence that defendant's cell, particularly including the light fixture, had been frequently searched since defendant became the cell's sole occupant, no reasonable jury would infer that he was unaware of the shank's placement there.

### 5. *Asserted cumulative error*

Defendant claims that the cumulative effect of the above-asserted errors was prejudicial and violated his rights under the Eighth and Fourteenth Amendments to a fair penalty trial and a reliable verdict. We conclude, however, that singly, or in combination, any such errors we have identified or assumed did not cause reversible prejudice.

### B. Denial of Defendant's Motion To Limit The Victim Impact Evidence

Defendant moved to limit the scope of victim-impact evidence to evidence about the victims of which defendant was aware, or to evidence that was admitted

during the guilt phase.  In the alternative, he requested that the trial court  give a special instruction regarding the jury's consideration of this evidence.  At the hearing held on the motion, and based on the prosecutor's offer of proof of the witnesses he intended to call to testify, the court denied both motions.

On appeal, defendant initially complains that the victim impact evidence admitted in this case should have been excluded because the testimony included information not within defendant's knowledge at the time the crimes were committed.  He contends that in order to minimize the prejudicial effect of victim impact evidence, such evidence should be limited to testimony (1) of a single witness (see *State v. Muhammad* (1996) 145 N.J. 23, 678 A.2d 164, 180); (2) describing the effect of the murder on a family member who was present at the scene during or immediately after the crime; and (3) concerning consequences of the crime that were known or reasonably apparent to the defendant at the time he committed the crime.  In addition, defendant contends that an interpretation of "circumstances of the crime" so broad as to permit the admission of the victim impact evidence admitted here would render that aggravating factor unconstitutionally overbroad and vague.  (U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, & 17.)

This court previously has rejected arguments "that victim impact evidence must be confined to what is provided by a single witness (*People v. Zamudio* (2008) 43 Cal.4th 327, 364), that victim impact witnesses must have witnessed the crime (*People v. Brown* (2004) 33 Cal.4th 382, 398), and that such evidence is limited to matters within the defendant's knowledge (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183)." (*People v. Carrington* (2009) 47 Cal.4th 145, 196-197 (*Carrington*).)  We also have concluded that "construing section 190.3, factor (a) to include victim impact evidence does not render the statute unconstitutionally

100

vague or overbroad." (*Id*. at p. 197.)  Defendant provides no persuasive argument for reconsideration of these decisions.

Next, defendant contends admission of the victim impact evidence here was "emotionally charged" and its admission rendered his trial fundamentally unfair, in violation of his rights to due process of law and to a reliable penalty determination.  (U.S. Const., 8th & 14th Amends.)  As we have stated, "[i]n a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution.  (*Payne v. Tennessee* (1991) 501 U.S. 808, 825-827.)" (*People v. Pollock*, *supra*, 32 Cal.4th at p. 1180; accord, *People v. Burney* (2004) 47 Cal.4th 203, 258 (*Burney*).)  "*Payne* reasoned that the prosecution has a legitimate interest in counteracting the relevant mitigating evidence that the defendant must be allowed to introduce.  [Citation.]  The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' [Citation.]  State law is consistent with these principles.  Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a).  [Citations.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056-1057 (*Lewis and Oliver*).)

Here, the testimony of the victims' family members and friends was essentially limited to explaining the direct impact of the murders and describing "the residual and lasting impact [the victims' family members and friends] continued to experience." (*Brown*, *supra*, 33 Cal.4th at p. 398.)  Coder's fiancée, Darlene Shelton, testified that she became hysterical when police informed her of Coder's death.  She was pregnant with his child when he was murdered, and her emotional reaction to his murder caused her difficulty during this pregnancy. Coder's sister, Dawn, testified that she was an "emotional wreck" during the week

101

following Coder's murder and mourned his death for a year. She also attributed the worsening of her thyroid condition to her distraught condition caused by his death. Coder's mother, Suzanne, described the horror she experienced seeing Coder's partially covered body at the scene. She testified that Coder was partially deaf, had a twin, and was close to his siblings. Coder's murder had caused her to experience "fits of depression." Martin's sister, Mary Ann, testified that another brother had died within six months of Martin's death and that as a result of Martin's murder, she no longer trusted people. This evidence did not exceed the bounds of admissible victim impact evidence set forth in *People v. Edwards* (1991) 54 Cal.3d 787, 836. (See also *People v. Boyette* (2002) 29 Cal.4th 381, 444-445 (*Boyette*).)

Finally, defendant contends the trial court erred by refusing his request to instruct the jury that the victim impact evidence must relate to the specific harm caused by defendant's crimes.[46] We disagree. In *People v. Ochoa* (2001) 26 Cal.4th 398 (*Ochoa*), this court rejected the defendant's claim that the trial court erred by refusing to give a similar instruction.[47] We reasoned that "[t]he

---

[46]  Defendant's proposed special instruction read as follows: "Evidence has been introduced for the purpose of showing the specific harm caused by [defendant]'s crimes. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether he should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as the result of an irrational, purely subjective response to emotional evidence and argument."

[47]  The proposed instruction in *Ochoa* stated: " 'Evidence has been introduced for the purpose of showing the specific harm caused by the Defendant's crimes. Such evidence was not received and may not be considered by you to divert your attention from your proper role of deciding whether the Defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional

*(Footnote continued on next page.)*

proposed instruction would not have provided the jury with any information it had not otherwise learned from CALJIC No. 8.84.1 . . . ." (*Ochoa*, at p. 455; accord, *Hartsch*, *supra*, 49 Cal.4th at p. 511.)  The jury here was given CALJIC No. 8.84.1 and, thus, was provided sufficient guidance regarding this aspect of penalty deliberations.  Any additional complaint by defendant that the trial court should have admonished the jury to disregard or limit its consideration of evidence of the possible effects of the victim's death, on the ground that such speculation is improper, has been forfeited by his failure to request an admonition at trial.  (See *Carrington*, *supra*, 47 Cal.4th at p. 197 [defendant's failure to request an admonition forfeited his claim that the trial court should have admonished the jury to ignore or limit its consideration of evidence of the possible effect of the victim's death on her mother's health].)

## C.  CALJIC No. 8.85

Defendant contends CALJIC No. 8.85 (Penalty Trial — Factors for Consideration), the standard instruction that describes the section 190.3 aggravating and mitigating factors the jury is to consider in deciding whether to impose a sentence of death or life imprisonment without possibility of parole, is constitutionally defective for various reasons.  Identical claims have previously been rejected, as follows.

As applied, section 190.3, factor (a) (circumstances of the capital crime) is not unconstitutionally vague and does not result in the arbitrary and capricious imposition of the death penalty.  (*Tuilaepa v. California* (1994) 512 U.S. 967, 975-

---

*(Footnote continued from previous page.)*

though relevant subjects may provide legitimate reasons for the Jury to show mercy to the Defendant.' " (*Ochoa*, *supra*, 26 Cal.4th at p. 455.)

976; *Ervine*, *supra*, 47 Cal.4th at p. 810; *People v. Salcido* (2008) 44 Cal.4th 93, 165 (*Salcido*).)

The trial court is not required to instruct the jury that the absence of a mitigating factor cannot be considered as an aggravating factor (*Riggs, supra*, 44 Cal.4th at p. 328) or to instruct the jury with CALJIC No. 8.85 without deleting inapplicable factors (*People v. Farnam* (2002) 28 Cal.4th 107, 191-192.)

The trial court is not obligated to advise the jury which statutory factors are relevant solely as mitigating circumstances and which are relevant solely as aggravating circumstances. (*People v. Farnam*, *supra*, 28 Cal.4th 107, 192.)

The use of the restrictive adjective " extreme" in the instruction on section 190.3, factors (d) and (g) does not unconstitutionally limit the jury's consideration of mitigating evidence. (*People v. Perry* (2006) 38 Cal.4th 302, 319.)

The trial court's failure to require the jury to make written findings regarding the aggravating factors it found under CALJIC No. 8.85 does not preclude meaningful appellate review. (*Geier, supra*, 41 Cal.4th at p. 620; see also *People v. Perry*, *supra*, 38 Cal.4th at p. 320 [CALJIC No. 8.88].)

As defendant offers no persuasive reason to reconsider these decisions, we adhere to our conclusions.

### D. CALJIC No. 8.88

Defendant claims CALJIC No. 8.88,[48] the principal sentencing instruction, is unconstitutional on various grounds. We have consistently rejected identical claims, and defendant advances no persuasive reason to revisit our decisions.

---

[48] The court instructed the jury under CALJIC No. 8.88 as follows: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be

*(Footnote continued on next page.)*

104

Thus, CALJIC No. 8.88 is not unconstitutional or impermissibly vague because it (1) uses the "so substantial" standard to compare aggravating factors with mitigating factors (*Rogers*, *supra*, 46 Cal.4th at p. 1179; *People v. Parson* (2008) 44 Cal.4th 332, 371 (*Parson*)); (2) requires the jury to determine whether the death penalty is "warranted" rather than "appropriate" (*People v. Lindberg* (2008) 45 Cal.4th 1, 52; *Boyette*, *supra*, 29 Cal.4th at p. 465); (3) fails to direct the jury that it must return a verdict of life without possibility of parole if it determines the aggravating circumstances do not outweigh the mitigating circumstances (*People v. Hughes* (2002) 27 Cal.4th 287, 405); (4) fails to direct the jury that if the mitigating circumstances outweigh those in aggravation, it must return a sentence of life imprisonment without the possibility of parole (*Parson, supra*, at p. 371; *Geier*, *supra*, 41 Cal.4th at pp. 618-619); (5) fails to advise the jury that it may return a verdict of life imprisonment without possibility of parole

---

*(Footnote continued from previous page.)*

guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶]  An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.  A mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.  [¶]  In the weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignments of weights to any of them.  You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.  [¶]  In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶]  To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

105

even if the mitigating factors outweigh the aggravating factors (*Rogers*, *supra*, 46 Cal.4th at p. 1179; *People v. Hovarter* (2008) 44 Cal.4th 983, 1028); or (6) fails to instruct the jury that neither party bears the burden of persuading it of the appropriateness or inappropriateness of the death penalty (*Friend*, *supra*, 47 Cal.4th at p. 90; *People v. Hayes* (1990) 52 Cal.3d 577, 643).

### E. Defendant's Requested Special Instructions Regarding the Scope of the Jury's Consideration of Aggravating and Mitigating Evidence

Defendant contends the trial court violated state law and his Eighth and Fourteenth Amendment rights to a fair and reliable penalty determination by denying his request for instructions clarifying the scope of aggravating and mitigating evidence the jury could consider as well as the scope of the jury's sentencing discretion. As explained below, we find no prejudicial error.

#### 1. *CALJIC Nos. 8.84 and 8.88*

Defendant asked the trial court to explain to the jury that a special circumstance renders a defendant death eligible, but the appropriate penalty is entirely up to the jurors. The proposed instruction, however, was duplicative of CALJIC Nos. 8.84 and 8.88. CALJIC No. 8.84 informed the jurors in this case that state law required that a defendant found guilty of a special circumstance murder be punished by death or confinement in prison for life without the possibility of parole and that "you must now determine *which of these penalties shall now be imposed on the defendant.*" (Italics added.) CALJIC No. 8.88 further advised the jurors that "you determine under the relevant evidence *which penalty is justified and appropriate.*" (Italics added.) The trial court thus properly denied this requested instruction.

#### 2. *CALJIC No. 8.85*

Defendant proposed a supplement to CALJIC No. 8.85 to instruct jurors that they were prohibited from "double counting" the same facts under section

106

190.3, factor (a), as both a circumstance of the crime and as a separate and distinct matter in aggravation of penalty.

When requested, a trial court should provide such an instruction. (*People v. Monterroso* (2004) 34 Cal.4th 743, 789.) Here, however, the trial court's refusal to do so was not prejudicial. We have explained that CALJIC No. 8.85 does not inherently encourage the jury to "double count" the same facts, contrary to defendant's argument. (*Monterroso*, at pp. 789-790; see also *Ervine*, *supra*, 47 Cal.4th at p. 811.) Further, because the prosecutor did not mislead the jury or otherwise suggest it engage in improper double counting, the absence of an instruction cautioning against double counting does not require reversal. (*Monterroso*, *supra*, at p. 790.)

Defendant additionally asked the trial court to modify CALJIC No. 8.85 to explain, with regard to section 190.3, factor (k), that the enumerated mitigating circumstances are only examples, that the jurors could consider any other circumstances as reasons for not imposing death, that a single mitigating factor alone may be sufficient to reject death as the appropriate penalty, that the jurors need not be unanimous in finding mitigating factors, and that mitigating factors need not be proved beyond a reasonable doubt but may be supported by any evidence, no matter how weak.

The trial court properly denied defendant's requested modification. Pursuant to the standard version of CALJIC No. 8.85, the trial court instructed the jury that it could consider, take into account, and be guided by, among other things, "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or

107

innocence phase of this trial which conflicts with this principle." (CALJIC No. 8.85, factor (k).) We have repeatedly held that this instruction "adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy." (*Burney, supra*, 47 Cal.4th at p. 261; see *People v. Butler* (2009) 46 Cal.4th 847, 875; *People v. Valencia* (2008) 43 Cal.4th 268, 309.) In addition, the proposed instruction was unnecessary and, in large part, argumentative. Therefore, the trial court was not obligated to give it. (See *People v. Lucero* (2000) 23 Cal.4th 692, 729; see also *People v. Hines* (1997) 15 Cal.4th 997, 1067-1068.)

### 3. CALJIC No. 8.88

Defendant requested that CALJIC No. 8.88 be supplemented to inform the jurors that they could return a life verdict even in the absence of mitigating factors and despite the presence of aggravating factors.

The trial court did not err in refusing to supplement this instruction as requested, as we have previously rejected a similar claim. (See *Rodrigues*, *supra*, 8 Cal.4th 1060, 1192.) In any event, CALJIC No. 8.88 adequately advises jurors on the scope of their discretion to reject death and to return a verdict of life without possibility of parole. (*Stitely*, *supra*, 35 Cal.4th at p. 574.)

### 4. Mercy and sympathy

Defendant requested an instruction that would have informed the jurors that they could spare defendant's life based on mercy or sympathy alone. But such an instruction is not required; indeed, the jury may be admonished that it should *not* decide the penalty on the basis of "mere," or "factually untethered," sympathy. (*People v. Tate*, *supra*, 49 Cal.4th at p. 711; see also, e.g., *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1275; *California v. Brown* (1997) 479 U.S. 538, 542-543.)

Under CALJIC No. 8.88, the jury was properly instructed, in part, that "[it] is free to assign whatever moral or sympathetic value you deem appropriate to

108

each and all of the various factors you are permitted to consider." In addition, the jury was informed under CALJIC No. 8.85 that it could consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." No error occurred.

### 5. *Deterrence and cost*

Defendant faults the trial court for refusing his request to instruct the jury that, in determining the appropriate penalty, it could not consider (1) whether the death penalty is a deterrent, or (2) the cost to the state of execution versus life imprisonment. We have said that, although a trial court would not err in giving the requested instruction, its refusal to do so is not prejudicial when such considerations are not raised at trial. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 146; *People v. Thompson* (1988) 45 Cal.3d 86, 132; see also *Ochoa*, *supra*, 26 Cal.4th at p. 456.) Here, only defense counsel commented on the issues of deterrence and cost during argument, briefly mentioning to the jury that these issues were not listed among the aggravating and mitigating factors that it could consider in making its penalty determination. The prosecutor never suggested the contrary. Under these circumstances, the trial court's refusal to give this instruction was harmless.

### F. Constitutional Challenges to California's Death Penalty Law and Related Instructions

Defendant argues that California's death penalty law and related instructions are unconstitutional in various respects. This court has consistently rejected similar claims, and defendant offers no persuasive reason for reconsidering these holdings.

"[C]ategorizing as especially deserving of the ultimate penalty those offenders who kill two or more victims in one criminal event is not arbitrary, unfair or irrational, and performs the necessary narrowing of the pool of potential

109

offenders required by the Eighth Amendment to the United States Constitution." (*Boyette¸ supra*, 29 Cal.4th at p. 440.)

The jury's consideration of unadjudicated criminal conduct in fixing the penalty under section 190.3, factor (b), does not violate a defendant's state or federal constitutional rights to due process, equal protection, and a reliable penalty determination. (*McWhorter*, *supra,* 47 Cal.4th at p. 378; *Brown*, *supra*, 33 Cal.4th at p. 402.) In addition, this court has "long recognized that, as ' "[section 190.3, factor] (b) imposes *no* time limitation on the introduction of 'violent' crimes; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life." ' " (*People v. Williams*, *supra*, 16 Cal.4th at p. 233, quoting *People v. Douglas* (1990) 50 Cal.3d 468, 529, quoting *People v. Balderas* (1985) 41 Cal.3d 144, 202, original italics.) Also, the jury may consider evidence of juvenile violent criminal misconduct as an aggravating factor under section 190.3, factor (b). (*People v. Roldan* (2005) 35 Cal.4th 646, 737; *People v. Lucky* (1988) 45 Cal.3d 259, 296.)

"The absence of procedural safeguards utilized by other states in the operation of their death penalty laws does not render California's law unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments. [Citations.] As we have repeatedly concluded, ' [t]he jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes), that aggravating circumstances outweigh mitigating circumstances, or that death is the appropriate penalty.' " (*People v. Beames* (2007) 40 Cal.4th 907, 934, quoting *People v. Morrison* (2004) 34 Cal.4th 698, 730; *People v. Blair* (2005) 36 Cal.4th 686, 753.)

With the exception of prior violent offenses and prior convictions under section 190.3, factors (b) and (c), respectively, the court is not required to instruct

regarding the burden of proof or to instruct the jury that there is no burden of proof at the penalty phase. (*People v. Cruz* (2008) 44 Cal.4th 636, 681; *Parson, supra*, 44 Cal.4th at p. 370.) The United States Supreme Court's decisions in *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 961, *Ring v. Arizona* (2002) 536 U.S. 584, and *Apprendi v. New Jersey* (2000) 530 U.S. 466, do not affect California's death penalty law or otherwise require reconsideration of the foregoing decisions. (*Friend, supra*, 47 Cal.4th at p. 89; *Salcido*, *supra*, 44 Cal.4th at p. 167; see also *People v. Morrison*, *supra*, 34 Cal.4th at p. 731.)

The trial court's failure to inform the jury that there is a presumption of life does not violate a defendant's constitutional rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protection of the law under the Fifth, Eighth and Fourteenth Amendments to the federal Constitution. (*Parson*, *supra*, 44 Cal.4th at p. 371; *People v. Abilez* (2007) 41 Cal.4th 472, 532.)

The death penalty statute is not unconstitutional for failing to provide intercase proportionality review. (*Zambrano, supra,* 41 Cal.4th at p. 1187; *Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1067.)

Because "capital defendants are not similarly situated to noncapital defendants, the death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to noncapital defendants." (*People v. Cruz*, *supra*, 44 Cal.4th at p. 681; see *People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

Defendant's death sentence violates neither international law nor his rights under the Eighth and Fourteenth Amendments to the federal Constitution, as no authority "prohibit[s] a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002)

111

27 Cal.4th 469, 511.)  Unless a defendant establishes his trial involved prejudicial violations of state or federal constitutional law, we need not consider the question whether he also suffered violations of international law.  (*People v. Bolden* (2002) 29 Cal.4th 515, 567)

### G.  Cumulative Effect of Guilt Phase and Penalty Phase Errors

Defendant contends that the cumulative effect of the guilt and penalty phase errors violated his federal and state constitutional rights to a fair trial and reliable jury verdicts and requires reversal of his conviction and death sentence.  We reject the contention.  As noted, we have found no error that was individually prejudicial.  Having carefully reviewed the record, we are persuaded that the cumulative effect of any such errors was also harmless.

### V.  DISPOSITION

The guilt and penalty judgments are affirmed.


BAXTER, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
CHIN, J.
CORRIGAN, J.
TURNER, J.*

---

\*  Presiding Justice, Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY WERDEGAR, J.**

I fully endorse the majority's preliminary holdings that, with regard to defendant's claim the trial court improperly excused Prospective Juror R.A. for cause under the *Witt* standard (*Wainwright v. Witt* (1985) 469 U.S. 412 (*Witt*)), under our precedents defendant did not forfeit this claim on appeal by failing to object (maj. opn., *ante*, at p. 26), but that, in the future, a defendant in a capital case must make a timely objection or the functional equivalent to preserve the issue for appeal (*id.* at p. 33). Although the "no objection required" rule of *People v. Velasquez* (1980) 26 Cal.3d 425 is a venerable one, and one on which the court has recently relied (see *People v. Bivert* (2011) 52 Cal.4th 96, 112 ["We have held the failure to object does not forfeit a claim raised on appeal pursuant to . . . *Witt* . . . ."]), I am persuaded by the majority's discussion that the rule is ripe for reconsideration, and that—as a rule applicable prospectively only—we should require parties to make their objections known before they may on appeal challenge the excusal of a juror under the *Witt* standard.

With respect to the merits of the trial court's dismissal of Prospective Juror R.A. for cause, however, I disagree with the majority's conclusion the juror's written responses to the jury questionnaire alone, with no oral, face-to-face questioning to clarify his views, demonstrated it was clear and left no doubt he would be unable to temporarily set aside his views about the death penalty "in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176; see

1

also *People v. Wilson* (2008) 44 Cal.4th 758, 787.)  Because, as the majority acknowledges (maj. opn., *ante*, at p. 34), "[t]he erroneous exclusion of a prospective juror under [the *Witt* standard] compels reversal of the penalty verdict regardless of whether the prosecutor had remaining peremptory challenges," I conclude the trial court's dismissal of Prospective Juror R.A. requires reversal of the penalty judgment in this case.  On this basis, I dissent.

## I.

As the majority observes, a prospective juror in a capital case may be excused if the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "  (*Witt*, *supra*, 469 U.S. at p. 424, quoted by the maj. opn., *ante*, at p. 34.) The extent to which a trial court can properly make this determination without actually speaking to the prospective juror, relying solely on reading the juror's written responses in the jury questionnaire, has found its way to this court several times in recent years, no doubt because jury questionnaires have become a standard practice in capital case trials.  As we have recognized, written jury questionnaires can streamline the "long and tedious business" of choosing jurors in a capital case, and "[p]rudent use of written jury questionnaires can be a valuable addition to the process, serving as a screening tool during death qualifications of jurors."  (*People v. Wilson*, *supra*, 44 Cal.4th at p. 790.)  The devil, of course, is in the details.  (*People v. Thompson* (2010) 49 Cal.4th 79, 96-97 [when using a jury questionnaire to help choose jurors in a capital case, " '[t]he legitimate pursuit of laudatory efficiency should not be transformed into an arbitrary pursuit of speed for its own sake.' "].)

We first addressed the issue in *People v. Stewart* (2004) 33 Cal.4th 425. In *Stewart*, we reversed the penalty judgment on the facts of that case, but further suggested that it might not ever be a justifiable practice to excuse a prospective

2

juror for cause based solely on his or her written responses, which often take the form simply of boxes checked on a form. (*Id*. at pp. 449-450.) Less than two years later, however, we retreated from that position and specifically rejected *Stewart*'s suggestion that some in-person questioning was mandatory, holding that "nothing in *Stewart* indicates that an excusal without oral voir dire is improper where the prospective juror's answers to a jury questionnaire *leave no doubt* that his or her views on capital punishment would prevent or substantially impair the performance of his or her duties in accordance with the court's instructions and the juror's oath." (*People v. Avila* (2006) 38 Cal.4th 491, 531, italics added (*Avila*).) Thus, in *Avila*, we held "a prospective juror in a capital case may be discharged for cause based solely on his or her answers to the written questionnaire *if it is clear from the answers that he or she is unwilling to temporarily set aside his or her own beliefs and follow the law*." (*Ibid.*, italics added.)

Subsequent cases adopted the holding in *Avila*. In *People v. Wilson*, *supra*, 44 Cal.4th at page 787, this court held that "reliance on written responses alone to excuse prospective jurors for cause is permissible if, from those responses, *it is clear (and 'leave*[*s*] *no doubt'*) that a prospective juror's views about the death penalty would satisfy the *Witt* standard . . . ." (Italics added; accord, *People v. Thompson*, *supra*, 49 Cal.4th at p. 97.) In *People v. Russell* (2010) 50 Cal.4th 1228, 1263, we held the trial court "did not err by excusing . . . seven prospective jurors based solely on their *clear and unequivocal* written responses to the questionnaire." (Italics added.)

Accordingly, the standard for assessing on appeal the trial court's decision to dismiss Prospective Juror R.A. solely on the basis of his written responses in his jury questionnaire is whether it was clear and left no doubt he was unable or unwilling to put aside his views against the death penalty and follow the law. In this case, R.A. indicated he was strongly opposed to the death penalty and would

3

have difficulty applying it.  The majority finds this stated opposition sufficient to satisfy the test for excusing a juror under the *Witt* standard without any clarification that might come from questioning the juror in person.

I disagree.  That a juror strongly opposes the death penalty and states he or she would have difficulty applying it is the *starting point* of our inquiry, not the ending point.  As we explained in *People v. Wilson*, *supra*, 44 Cal.4th at pages 785-786:  "[T]he mere fact a prospective juror, in a written questionnaire, checked a box or otherwise expressed a personal opposition to the death penalty does not permit the court to automatically disqualify him or her from the jury.  'Decisions of the United States Supreme Court and of this court make it clear that a prospective juror's personal conscientious objection to the death penalty is not a sufficient basis for excluding that person from jury service in a capital case under [*Wainwright v.*] *Witt*, *supra*, 469 U.S. 412.  In *Lockhart v. McCree* (1986) 476 U.S. 162, 176 . . . , the high court observed that "not all those who oppose the death penalty are subject to removal for cause in capital cases; <u>those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of law</u>."  Similarly, in *People v. Kaurish* (1990) 52 Cal.3d 648, 699 . . . , we observed:  "Neither *Witherspoon* [*v. Illinois* (1968) 391 U.S. 510 . . .] nor [*Wainwright v.*] *Witt*, . . . nor any of our cases, requires that jurors be automatically excused if they merely express personal opposition to the death penalty.  The real question is whether the juror's attitude will ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 424, fn. omitted.)  A prospective juror personally opposed to the death penalty may nonetheless be capable of following his oath and the law.  *A juror whose personal opposition toward the death penalty may predispose him to assign*

4

*greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict.*"  (Italics added.)'  [Citation.]"  (Underscoring added.)

The majority reasons that R.A.'s written answers do not clearly show that he could set aside his views and apply the law.  (Maj. opn., *ante*, at p. 42.)  But that is not the test.  In order for the trial court to excuse a prospective juror on the written record alone, without oral voir dire, the clarity in the record must be that the prospective juror *could not* set aside his or her views against the death penalty.  An excusal without any oral voir dire is permitted only "if it is clear from the answers that he or she is *unwilling* to temporarily set aside his or her own beliefs and follow the law."  (*Avila*, *supra*, 38 Cal.4th at p. 531, italics added.)  By instead reasoning the trial court's excusal of R.A. was justified because the record does not clearly show *he could* set aside his views, the majority has reversed the applicable test, thereby making it easier to remove those prospective jurors who lean against capital punishment.  In so doing, the majority neither acknowledges the change nor proffers any legal authority in support; nevertheless, trial courts now will be encouraged to forgo oral questioning of prospective jurors who hold negative views about the death penalty and simply assume they are excludable under *Witt* unless the record clearly shows otherwise.  That is not the law.  (*Lockhart v. McCree*, *supra*, 476 U.S. at p. 176; *People v. Wilson*, *supra*, 44 Cal.4th at p. 785.)

To be sure, R.A.'s written answers indicated he held strong views against the death penalty.  But he also acknowledged he could follow the law and the court's instructions, that nothing would prevent him from doing so in this case, and given three choices in question No. 46, declined to indicate he would "ALWAYS" vote for the death penalty irrespective of the evidence or

"ALWAYS" vote for a life sentence, but instead chose the third alternative provided by the questionnaire: "I would consider all of the evidence and the jury instructions as provided by the court and impose the penalty I personally feel is appropriate." (Maj. opn., *ante*, at p. 37, fn. 22 [reproducing the entirety of question No. 46].) On this record, one cannot say "it is *clear* from [R.A.'s] answers that he . . . is *unwilling* to temporarily set aside his . . . own beliefs and follow the law." (*Avila*, *supra*, 38 Cal.4th at p. 531, italics added.)

In support of its contrary conclusion, the majority devalues R.A.'s answer to question No. 46, both by emphasizing that we must consider R.A.'s answers in their totality (maj. opn., *ante*, at p. 41 [purporting to evaluate "the whole record"]), and by characterizing his response that he would consider all of the evidence and would not "ALWAYS" vote for life, as a "pro forma" answer (*ibid*.). The totality of R.A.'s responses, however, *includes* his answer to question No.46, which affirms that he would set aside his personal views and follow the law.[1] Moreover, the concept of a "pro forma" response—as opposed evidently to some more trustworthy or sincere response—injects a new element into the law never before articulated. It also is meaningless. On a cold record, to determine that any particular answer to a multiple choice question is "pro forma" rather than sincerely felt is impossible.

The design of jury questionnaires has not yet evolved to the point where the answers elicited are always sufficiently clear and unambiguous to permit determination of a juror's qualifications for *Witt* purposes. Question No. 46 in the questionnaire used in this case is a good example. No doubt prospective jurors

---

[1]  The totality of his answers also includes R.A.'s statement, in response to a question asking if his views about the death penalty have changed over time, that he had "become more passive due to life's experiences," suggesting a lessening of his opposition to the penalty.

choosing they would "ALWAYS" vote for a sentence of life or a sentence of death, irrespective of the evidence, were deemed excludable without the need of further clarification, and rightly so.  (See *People v. Wilson*, *supra*, 44 Cal.4th at pp. 783, 788-790 [by checking they would "ALWAYS" vote for life in prison "[n]o matter what the evidence was," jurors indicated they were excludable under *Witt*]; *Avila*, *supra*, 38 Cal.4th at pp. 531-533 [same].)  Prospective Juror R.A., however, rejected those two choices and chose the third alternative; that is, he indicated he would consider all of the evidence and the jury instructions and would vote for "the penalty I personally feel is appropriate."  By concluding this answer was insufficient to require further inquiry of R.A. and forestall his summary dismissal from the jury panel, the majority necessarily treats question No. 46 as a question with *no* right answer.

Moreover, in dismissing question No. 46 because it allows jurors to choose a penalty they "personally feel is appropriate" (maj. opn., *ante*, at p. 42, italics omitted), the majority's reasoning leads them to a logical contradiction.  If, as the majority seems to think, question No. 46, answer "c" does not fairly ask jurors if they can or will set aside their personal views, consider the evidence and the jury instructions, and follow the law, *then the questionnaire fails to ask the key question under Witt*:  Can the juror set aside his or her personal views and apply the law, or would the person's views about capital punishment " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "  (*Witt*, *supra*, 469 U.S. at p. 424.)  Without a response to that question, a juror's *Witt* qualification cannot be determined without a clarifying oral inquiry.

In addition, the record shows many prospective jurors who were not dismissed from the jury based solely on their written responses answered question No. 44a concerning support for the death penalty by circling either "9" or "10,"

7

indicating their strong support.  Some of these jurors—like R.A.—also checked "c" for their answer to question No. 46, indicating they would consider the evidence and jury instructions and vote for "the penalty I personally feel is appropriate."  The retention of these strongly pro-death-penalty jurors suggests the trial court found that checking answer "c" to question 46 was informative and relevant for *Witt* purposes.

Had the trial court questioned R.A. in person, observed his facial expressions and his demeanor, evaluated his vocal inflections and general bearing, and then made a conclusion about the depth of his understanding of his duty as a juror as well as his sincerity—in short, his state of mind—the court's conclusion as to his qualification would be virtually unassailable on appeal.[2]  With no such factual finding as to R.A.'s true state of mind following an in-person examination, however, we are left simply with his inconsistent written answers.  By finding R.A. was excludable under the *Witt* standard, the majority—without acknowledging it—is making a selective credibility determination based on his written responses, accepting some of his answers (e.g., his opposition to the death penalty) as reflecting his true state of mind while discounting others (e.g., that he would consider all of the evidence and vote for the appropriate penalty) as less indicative of his true beliefs.  To conclude it was clear and left no doubt that R.A.'s written responses rendered him excludable under *Witt*, the majority applies a selective evaluation of the record and thereby undermines defendant's constitutional right to an impartial jury.

---

[2]     *People v. Abilez* (2007) 41 Cal.4th 472, 497 (following oral voir dire, a trial court's evaluation of a prospective juror's state of mind is binding on the appellate court).  "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."  (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.)

## II.

On this record, reviewing the question de novo as we must (*People v. Thompson*, *supra*, 49 Cal.4th at p. 100; *Avila*, *supra*, 38 Cal.4th at p. 529), we cannot be confident Prospective Juror R.A.'s views concerning the death penalty, as expressed solely in his written responses to the jury questionnaire, would have prevented or substantially impaired his ability to perform the duties of a juror " 'in accordance with his instructions and his oath' " (*Witt*, *supra*, 469 U.S. at p. 424), or that he was not "willing to temporarily set aside [his] own beliefs in deference to the rule of law" (*Lockhart v. McCree*, *supra*, 476 U.S. at p. 176). That is, on this record, the People cannot show it is clear and leaves no doubt that R.A.'s views about the death penalty would satisfy the *Witt* standard. (*People v. Wilson*, *supra*, 44 Cal.4th at p. 787.) By holding otherwise, the majority contravenes defendant's "right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." (*Uttecht v. Brown*, *supra*, 551 U.S. at p. 9.)

For these reasons, I dissent.

**WERDEGAR, J.**

9

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. McKinnon
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S077166
**Date Filed:** August 22, 2011

_____

**Court:** Superior
**County:** Riverside
**Judge:** Patrick F. Magers

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and C. Delaine Renard, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Ivy Fitzpatrick, Douglas P. Danzig and Robin Derman, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

C. Delaine Renard
Deputy State Public Defender
221 Main Street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Robin Derman
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92100
(619) 645-2285